36 N.J. Super. 485 (1955)
116 A.2d 532
BOROUGH OF PARK RIDGE, APPELLANT,
v.
ANTHONY J. SALIMONE, AND DEPARTMENT OF CIVIL SERVICE, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 6, 1955.
Decided July 7, 1955.
*487 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. George F. Losche argued the cause for the appellant.
Mr. Julius E. Kramer argued the cause for the respondent, Anthony J. Salimone (Messrs. Chandless, Weller & Kramer, attorneys).
Mr. John F. Crane, Deputy Attorney-General, argued the cause for the respondent, Department of Civil Service (Mr. Grover C. Richman, Jr., Attorney-General of New Jersey, attorney).
The opinion of the court was delivered by FRANCIS, J.A.D.
After hearing on charges the respondent, Anthony J. Salimone, was dismissed as police chief by the Mayor and Council of the Borough of Park Ridge, N.J. The Civil Service Commission reversed and ordered reinstatement. The borough is prosecuting this appeal.
Salimone, who had been the police chief of Park Ridge for many years, was indicted by the Bergen County Grand Jury on February 13, 1951. The indictment charged him and others with conspiracy to make book upon the running of horses, contrary to R.S. 2:119-1 (now N.J.S. 2A:98-1). The overt acts alleged to be in furtherance of the conspiracy were (1) the operation of a bookmaking establishment in a room of a dwelling house at 163 Morningside Avenue, Park Ridge, N.J., which was the home of one Conrad Grube, and (2) the payment by Salimone of $25 a week to Grube for the use of his home and the telephone installed therein to *488 facilitate the illegal activity. On the day the indictment was returned, Salimone was suspended from duty by the governing body of his municipality. At or about the same time, he was named defendant in another indictment which charged misconduct in office.
On October 24, 1951 Salimone was convicted in the County Court of the bookmaking offense. About five weeks later, and prior to the determination of his appeal therefrom to the Appellate Division, written charges of violation of the rules of the police department were filed against him with the mayor and council of the borough. The infractions cited were four in number. They alleged:
(1) He had been convicted under the indictment of conspiring to make book rendering him guilty of violation of subsection 11 of section 28 of the rules of the police department and of violating subsection 14 of section 20 of the borough ordinance which make violation of any criminal law ground for removal.
(2) "That on or about May 8, 1950, and on divers other dates, at Park Ridge, said Anthony J. Salimone did confederate, conspire and agree to pay to Conrad Grube certain moneys for the use of telephones and telephonic equipment at the premises known as No. 163 Morningside Avenue, Park Ridge, in pursuance of a conspiracy and unlawful agreement between the said Salimone and the said Grube, by means and in furtherance of which bookmaking and the receiving and placing of bets on races were to be conducted from said premises" by reason of which Salimone violated subsections 16 and 17 of section 20 of the ordinance referred to prescribing "conduct unbecoming an officer" and "conduct subversive of good order and discipline of the force."
(3) "That on October 19, 1949, while on patrol duty said Anthony J. Salimone did receive a call or request to report to No. 163 Morningside Avenue, Park Ridge, and did fail to make an entry in the police blotter indicating the action taken by him, or if no action was taken, the reason therefor, and did also fail to enter therein such other information and particulars thereof which are customary and usual to an intelligent report and record of police activity," which constituted "neglect of duty and conduct subversive of good order and discipline of the force, in violation of subsections 13 and 17 of section 20" of the ordinance referred to.
(4) "That on October 19, 1949, upon being called there, said Anthony J. Salimone found certain County officers present at 163 Morningside Avenue, Park Ridge, and was told by one or more of them that a dice game or other gambling activity was in preparation or in operation" and that Salimone "wholly disregarding his obligation as a member and officer of the police department * * * *489 failed to take or to record the names of all persons found therein or connected therewith, and failed to report said alleged violation to the police committee of the Borough Council, and failed to make any complaint thereof or in connection therewith" which constituted "conduct unbecoming an officer and conduct subversive of good order and the discipline of the force" and a violation of "subsections 13 and 14 of section 28 and of section 34 of the Rules of the Police Department" and of subsections 13, 16 and 17 of section 20 of the ordinance cited.
The rules of the police department impose upon the members thereof these duties:
"2. To preserve the public peace; to prevent and suppress breaches of the peace; to prevent the commission of crime; to detect and arrest persons committing crimes within the Borough; * * * to secure the best and all evidence possible or available with respect to the commission of crimes, breaches of the peace and violation of the municipal ordinances * * *.

* * * * * * * *
4. He must at all times * * * conform to all the ordinances of the Borough and Rules of the Department."
Section 28 of the rules provides that the following acts or omissions shall be considered misconduct sufficient to warrant removal from the force:
"10. Incapacity, either mental or physical, lack of energy, or gross ignorance of the laws and regulations of the department.
11. Violation of any criminal law.

* * * * * * * *
13. Conduct unbecoming to any officer and gentleman.
14. Conduct subversive of good order and the discipline of the force.

* * * * * * * *
16. Failure to report a known violation of the law, or accepting a bribe or a favor as a consideration either for the performance or non-performance of his duty.

* * * * * * * *
18. Neglect of duty."
Section 34 of the rules requires every police officer, in case of crime:
"* * * to protect everything that might lead to the identification of the person or persons who might have committed the crime, then *490 immediately to get in touch with his superior officer, who, in turn, will see that the proper authorities are notified to obtain the necessary evidence in the way of fingerprints, etc."
The ordinance referred to in the complaint abstracted above provides among other things that a member found guilty of:
"10. Incompetency.

* * * * * * * *
13. Neglect of duty.
14. Violating any criminal law or penal ordinance.

* * * * * * * *
16. * * * Conduct unbecoming an officer and a gentleman.
17. * * * Conduct subversive of good order and discipline of the force,"
may be removed from office. Section 20.
The mayor and council conducted a hearing on December 19 and 26, 1951, at which testimony was adduced in support of the charges. Salimone offered no defense. On December 26 he was found guilty of all four charges and a resolution was adopted dismissing him from the department.
Formal notice of dismissal was served personally on Salimone and a copy given to his counsel on the night of December 26. It was entitled: "Final notice of suspension, fine, demotion, removal or other disciplinary action affecting a permanent officer or employee in the classified civil service." (Emphasis ours.) It was addressed to Salimone and immediately below, in the center of the page, appeared:

"Civil Service Title Chief of Police."
The notice of dismissal was filed with the Department of Civil Service as required by R.S. 11:22-38 and R.S. 11:15-3. On January 7, 1952, the Department wrote the borough that "in the absence of an appeal, we have recorded your action in dismissing Anthony J. Salimone, Chief of Police, from the Police Department, effective December 26, 1951, * * *." This letter undoubtedly was written in conformity with R.S. 11:22-38 which ordains that such a dismissal shall not *491 take effect until approved by order of the Commission, and which provides also that if no application for investigation of the dismissal is made within the time limited "such order may be approved, as of course, without hearing or investigation."
With respect to appeals from such dismissals from service in municipalities which operate under the Civil Service Act (R.S. 11:1-1 et seq.; R.S. 11:20-1 et seq.), N.J.S. 11:2A-1 provides:
"No employee of * * * any * * * municipality * * * shall be * * * discharged without the same right of appeal to the commission, which shall have the same power of revoking or modifying the action of such [municipality], as in the case of removal as provided in sections 11:15-2 to 11:15-6 of the Revised Statutes * * *."
Under R.S. 11:15-4 the appeal from a dismissal must be "received within ten days from the date of such removal." Section 38 (R.S. 11:22-38), which is in some measure in pari materia, says that the order of dismissal may be approved if within ten days after notification thereof the employee shall not "apply to the commission for an investigation of the charges * * *." And section 39 (R.S. 11:22-39) says that "if" such an application is made "within the time prescribed" the Commission shall fix a time and place for hearing.
Although it plainly appeared on the notice of dismissal that the Civil Service Act was applicable, Salimone did not appeal to the Commission within the ten-day period. Instead he filed a notice of appeal in the Bergen County Court on January 9, 1952, 14 days after his dismissal. When it was served on the proper official of the borough, if at all, does not appear. (See R.S. 40:47-10).
The appeal was taken to the County Court in error, counsel's affidavit indicating that he was unaware that the borough had previously adopted the Civil Service Act. He proceeded under R.S. 40:47-10, which provides for appeal to that court from such dismissals in municipalities not subject to civil service rule. However, it may be noted that even under this *492 statute the appeal must be taken within ten days after notification of conviction.
By notice dated January 23, 1952, the borough advised Salimone's counsel that a motion to dismiss the appeal for lack of jurisdiction in the County Court would be made. On February 8, the motion was granted and the appeal dismissed.
In the meantime on February 4 Salimone through counsel wrote a letter to the Civil Service Commission, which apparently was designed to be and was taken to be a notice of appeal and a request that the matter be set down for hearing. This was 40 days after Salimone's discharge from the force. No copy was sent to the borough nor is one included in the appendix. On February 5 the application to fix a hearing date was denied by the Commission on the ground that the appeal was not taken within the ten-day period prescribed by R.S. 11:15-4 and R.S. 11:22-38.
Subsequently on February 18 an affidavit was filed by counsel for Salimone, apparently in support of an application for reconsideration of the matter, which recited the mistaken appeal to the Bergen County Court and the fact that an appeal from the criminal conviction was pending and undecided in the Appellate Division. On February 19, without notice to or knowledge of the borough, the Commission decided to entertain the appeal. The reason assigned for the action as it appears later in the record was:
"As we interpret R.S. 11:15-4, we do not believe it was the intent of the Legislature to deny a public employee who is removed from his position the right of appeal when said appeal is not received within ten days from the date of such removal. It is our observation that the matter of granting a hearing on an appeal filed after the 10 day period is within the discretion of this Commission and it would have been inequitable and unfair under the circumstances of this case to deny a hearing. The Civil Service Commission is an administrative agency, and, as such, we believe it has the right to administer in a liberal fashion its power and duties and the rules and regulations which pertain to the protection of the rights of public employees. It has been the policy of the Civil Service Commission to accept notices of appeal as long as they are received within a reasonable time after the removal, suspension, fine or demotion."
*493 The first notice to the borough of the decision to entertain the appeal came from the Commission on February 25. The letter advised that at the meeting of February 19 an application had been made for a hearing and the conclusion had been reached to grant it after the Appellate Division disposed of the appeal in the criminal case.
On May 26, 1952, the Appellate Division reversed the conviction and granted a new trial. State v. Salimone, 19 N.J. Super. 600. The opinion observed that "There was plenary proof to support a finding of defendant's guilt of conspiracy to violate the bookmaking statutes." Id., 19 N.J. Super., at page 605. However, a reversal was declared to be required because of the rejection by the trial court of evidence of a certain statement which was deemed relevant on the subject of the credibility of the chief witness for the State.
Retrial resulted in an acquittal. The record indicates also that two trials of the misconduct indictment ended in jury disagreements. Later, the indictment was nolle prossed. The Civil Service Commission then notified the parties that the hearing on Salimone's appeal would be held on October 5, 1952.
At the outset of this hearing, the borough moved to dismiss the appeal because it had not been taken within ten days as required by the statute. A further ground was urged also, namely, that no notice had been given of the application of Salimone to the Commission for reconsideration of its previous dismissal of or refusal to retain his appeal. The motion was denied for the reason outlined above.
The matter then proceeded; testimony offered by the parties was taken. At the conclusion of the hearing the Commission found Salimone not guilty of violations of the ordinance or police department rules and reversed the dismissal by the mayor and council of the borough.
In its attack on the reversal the borough first assails the legal propriety of reconsideration of the earlier ruling of February 5 refusing to entertain Salimone's appeal and to grant a hearing thereon. Specifically, the argument is that once the matter had been ruled upon and disposed of, a *494 reconsideration or rehearing should not have been granted without notice to the borough and an opportunity to be heard.
The Commission, as an administrative agency invested with quasi-judicial powers, has the undoubted inherent authority to reconsider or to grant a rehearing with respect to its judicial acts. However, as the Supreme Court has said, the exercise of that authority is subject to the traditional demands of due process. Consequently, "there cannot be a substantial change in the rights of the parties without a hearing on notice." Handlon v. Town of Belleville, 4 N.J. 99, 107, 16 A.L.R.2d 1118, 1124 (1950).
Apart from the issue of jurisdiction stemming from the statutory ten-day time limitation on an appeal (Handlon v. Belleville, supra, 4 N.J., at page 107; Kaske v. State, 34 N.J. Super. 222 (App. Div. 1955)), which will be considered later, it is our judgment that in the situation presented here, the Commission should not have reconsidered its earlier decision and reversed itself until reasonable notice had been given and the borough had an opportunity to be heard.
However, on the record before us, if authority to entertain the appeal actually existed, the error would not appear to be so prejudicial as to require a reversal. R.R. 1:5-3(b). At the time of the hearing and prior to the taking of testimony, the borough was accorded an opportunity to move to dismiss the appeal as being out of time. The matter was then fully argued and when the ruling was adhered to, the question was adequately preserved for consideration by us. Then the basic merits of the controversy were tried fully, both parties being permitted to offer all the relevant evidence they desired to introduce.
This brings us to a consideration of the view of the Commission that the ten-day time fixed for the taking of an appeal is merely directory and that authority exists to entertain an appeal as long as the notice is received within a reasonable time after receipt by the employee of notice of discharge.
The courts have long recognized the need for prompt action by public employees in seeking judicial review of their *495 discharge. The reason is obvious. It is important that public duties be carried on without interruption or with as little interruption as possible. A governing body must be allowed to fill the employment in the public service with all necessary dispatch free from unnecessary risk of double payment of wages. Atlantic City v. Civil Service Commission, 3 N.J. Super. 57 (App. Div. 1949); Marjon v. Altman, 120 N.J.L. 16 (Sup. Ct. 1938); O'Leary v. Common Council of City of South Amboy, 8 N.J. Misc. 559 (Sup. Ct. 1930); Belli v. City of Passaic, 8 N.J. Misc. 641 (Sup. Ct. 1930); Glori v. Board of Police Commissioners, 72 N.J.L. 131 (Sup. Ct. 1905); Taylor v. Board of Councilmen of City of Bayonne, 57 N.J.L. 376 (Sup. Ct. 1894); State ex rel. Ball v. City of Knoxville, 177 Tenn. 162, 147 S.W.2d 97, 145 A.L.R. 762 (Sup. Ct. 1941); Annotation, 145 A.L.R. 767.
The Civil Service Commission is of statutory birth. It has only such authority as is expressly conferred by the legislative enactment or such as arises through necessary implication in order to effectuate the purposes for which it was created. Reasonable doubt as to the possession of particular power must be resolved against the existence thereof. Tanis v. Passaic County, 126 N.J.L. 303 (E. & A. 1941); Maguire v. Van Meter, 121 N.J.L. 150 (E. & A. 1938); City of Newark v. Civil Service Commission, 115 N.J.L. 26 (Sup. Ct. 1935).
The pertinent statutes, R.S. 11:15-4, R.S. 11:22-38; R.S. 11:22-39, make it clear that an employee's appeal must be taken within ten days after notification of his removal. We have been referred to no case which holds that after the expiration of the allotted time the right of appeal is lost and the Commission then lacks authority to receive such an appeal. But the few references to be found in the cases seem to accept the limitation as binding. For example, in Weaver v. New Jersey Department of Civil Service, 6 N.J. 553 (1951), the Supreme Court said:
"R.S. 11:15-4 incorporated by reference in R.S. 11:2A-1, requires of the Commission that `upon the appeal of the removed employee, if such appeal is received within ten days from the date of *496 such removal, it shall publicly inquire into and hear the person sought to be removed either sitting as a body or through one or more of its members.' The plaintiff here appealed within this statutory time." (Emphasis ours)
And in City of Newark v. Civil Service Commission, 114 N.J.L. 406, 411 (Sup. Ct. 1935), this was said:
"* * * It was the duty of the commission, appeal by the police officer having been taken within the time prescribed by law, to make an independent investigation, to hold an independent hearing and determine the merits on the testimony taken before it." (Emphasis ours)
Under the new system, our courts have recognized the binding force  even the jurisdictional restriction  of a time limit imposed on the taking of appeals by the rules of practice. In re Caruso's Will, 18 N.J. 26 (1955); In re Pfizer's Estate, 6 N.J. 233 (1951); Theresa Grotta Home v. Board of Adjustment, 19 N.J. Super. 331 (App. Div. 1952). We find no justification for the adoption of a contrary rule in dealing with a statutory limitation on the right of appeal to an administrative agency. Cf. Kaske v. State, 34 N.J. Super. 222 (App. Div. 1955); Lamastra v. Montgomery Ward & Co., 25 N.J. Super. 14 (App. Div. 1953); Kolonkiewicz v. W. Ames & Co., 23 N.J. Super. 265 (Cty. Ct. 1952); Fishman v. Fisch Hat Co., 16 N.J. Misc. 316 (C.P. 1938); Rule 59, Civil Service Commission. If hardship in a particular case consequent upon a failure to comply with the court rule did not provide a basis for relaxation of the rule, no different result is justifiable in a statutory proceeding. In re Nuese's Estate, 15 N.J. 149 (1954); In re Pfizer's Estate, supra.
Subsequent to the Pfizer case, the Supreme Court recognized that in some cases justice and equity might require extension of time for appeal within the court system. Consequently an amendment of the rule was promulgated which permits enlargement of the period, not to exceed 30 days, upon a showing of good cause by the applicant and absence of prejudice to his adversary. R.R. 1:27B(2). If it is *497 considered that the time for the statutory appeal to the Civil Service Commission is too restrictive, a remedy lies in the legislative domain.
It is suggested alternatively that the Commission possessed authority to entertain Salimone's appeal under R.S. 11:22-40. The section provides:
"The Commission may, of its own motion, if in its opinion section 11:22-38 of this title has not, in the matter of such order for removal, discharge, fine or reduction, been fully complied with, or if an affidavit that they have been violated shall be presented, direct a hearing and approve or disapprove the order the same as if an application for investigation as provided by section 11:22-38 of this title had been made." (Emphasis ours)
But we are not concerned here with a matter which was initiated on the Commission's own motion. Salimone appealed; the appeal was out of time and it was rejected. On application for reconsideration supported by affidavit, the contents of which are referred to above, the Commission took the view that the ten-day limitation was not binding and that it had the discretionary right to accept an appeal filed within a reasonable time after notice of discharge. Then declaring that it would be inequitable to refuse consideration of the appeal because a mistake had been made in seeking a review in the County Court, the original refusal was reversed and the tardy appeal retained. The Commission never intimated that it was acting on its own motion under section 40.
Nor is there any indication that either of the two prerequisites to action under section 40 existed or was found or used as a basis for the retention of the appeal: no opinion was expressed that section 38 had not "in the matter of the order for * * * discharge" * * * "been fully complied with"; nor does it appear that an affidavit was filed showing that the requirements of section 38 had been violated. Under the circumstances we find no record to support action under section 40. (See also Sullivan v. Roe, 18 N.J. 156, 160 (1955)).
Accordingly we conclude that the Commission was without authority to pass upon the propriety of Salimone's discharge.
*498 A hearing of this kind before the Civil Service Commission is de novo. R.S. 11:22-39. The matter is decided upon the evidence adduced at that time. In view of the nature of the case, the disparate conclusions reached by the authorities in the Borough and the Commission and the fact that the public service is involved, we have decided to make an independent study of the record under R.R. 1:5-4(b) without regard to our disposition of the jurisdictional issue.
The first accusation against Salimone was predicated upon his conviction of conspiracy to make book. Trial before the governing body was conducted without awaiting the decision of the Appellate Division because of the strictures of R.S. 40:47-8. However, the subsequent reversal eliminates the conviction as a basis for removal from public employment.
The second charge arises from substantially the same factual matter as the indictment. But the acquittal in the criminal case does not stand in the way of the departmental trial. The proceedings are entirely independent of each other. The quantum of proof necessary to convict is different. The proof might not be sufficient to demonstrate guilt of a crime to a jury beyond a reasonable doubt but it might indicate clearly and by the preponderance of the credible evidence an employee's guilt of conduct unbecoming a police officer or subversive of good order and discipline of the force. Beggans v. Civil Service Commission, 10 N.J. Misc. 1142 (Sup. Ct. 1932); Smith v. Carty, 120 N.J.L. 335, 343 (E. & A. 1938).
The chronology of events makes it more logical to consider the third and fourth charges first. Stated briefly, they charge neglect with respect to the alleged dice game at the Grube garage.
Conrad Grube, the principal witness for the borough, had lived at 163 Morningside Avenue, Park Ridge, for over 25 years. The house is in a rather isolated section; it is a frame dwelling with a garage in the rear.
Grube was 71 years of age in 1949 and apparently was living on a small income or pension of $45 a month. He had known Salimone for over 20 years and from time to time *499 borrowed a few dollars from him and his wife and son-in-law. In October 1949 he testified that he went to Salimone and asked for help in finding a means of earning some extra money.
A few days later three men appeared at his home and rented the garage for $50 a week. It was to be used for a crap game. At their request he painted the windows black and provided a makeshift table for which he was paid. Salimone went by Grubes' house at least twice a day but said he never noticed the black windows.
The game ran for three nights before being raided on October 19, 1949, by Assistant Prosecutor De Puy and County Detectives Millington, De Lyle and Graver. Grube said he was in bed at the time but on request of one of the detectives, came into the garage. There were 12 or 15 men sitting there, one of them being one of the three who were running the game. The officers took their names and then De Puy told them to get out of Park Ridge and not to come back. No one was arrested.
At De Puy's order Salimone was telephoned. He was patrolling in the radio car at the time. However the message was transmitted to him and he arrived at the garage at 11:35 P.M. There he saw Grube, a person he later learned was "Mel Petano" (Malfitano?), and the prosecutor's men. On inquiry as to what was going on, no one answered him. They walked out taking Malfitano along. According to Salimone, he asked De Puy if he was bringing the man to the police station but again there was no answer.
De Puy departed, taking Malfitano with him in a car. Salimone, who said there was "ill feeling" between himself and De Puy and that he was suspicious of De Puy, followed them. He did not say who drove the other car but it is plain there was but one car. They proceeded to De Puy's home and went inside. Salimone parked about two blocks away and waited. Then he saw the man come out, get in the car and drive away.
Salimone says he followed. If he was suspicious before as to why there had been no arrest, presumably he was even *500 more concerned at seeing this stranger drive off in the car which he and De Puy had used. In any event, on direct examination he said:
"I lost the car when I came to Pascack Road on the right; * * *."
But on cross-examination his testimony took this course:
"Q. Then you waited until someone came out, didn't you, and then you followed this man down the road? A. I did.
Q. Then you stopped him? A. I did.
Q. Did you get his first name? A. I don't recall.
Q. Did you or not? A. Well, I don't recall.
Q. Did you write his name down anywhere? A. I may have. I don't recall. It's quite a while ago. I don't recall.
Q. Did you write it in the police blotter? A. No.
Q. Did you comminicate his name to anybody in the service above you in Park Ridge? A. I don't know. It may have been on the yellow pad.
Q. But you don't know? A. I am not sure.
Q. It is a rather important fact. A. It has been quite a while. I wish I could remember.
Q. You didn't keep a copy of that yellow sheet? A. It was our practice to send it to the Commissioner at the time. We just took out what we thought should go in the book.
Q. You were suspicious of De Puy, weren't you? A. Yes, sir.
Q. Did you get the license number of this man's automobile that you stopped on the road? A. I may have had it, I am not sure.
Q. But you made no report anywhere? A. I think there was a notation on the yellow sheet.
Q. That is the only place, and that yellow pad you know cannot be produced. A. He used to save them. I don't know what he does with them. He saved them. The Commissioners received those papers."
Then he conceded that he had testified in one of the trials on the misconduct indictment that he did not ask for the man's license identification, that he did not make a note of the car license number in the police blotter or any place.
In any event Salimone testified that all he obtained from the apprehended man was a telephone number in Bayonne which was supposed to be called, presumably by players, to learn the location of the crap game. While the record is *501 not as clear as it might be at this point, it does show that Salimone called this number:
"Q. Then you telephoned somebody in Bayonne? A. The fellow I had.
Q. Did you find out who that man was? A. I don't recall his name.
Q. But you told that man you were going to hold this man you had apprehended until he gave you certain information, is that right? A. Right.
Q. But notwithstanding that, you let him go, didn't you? A. I did.
Q. Without getting his name? A. I wouldn't say that.
Q. And without getting his license number? A. I wouldn't say that.
Q. Or getting any identifying marks concerning this man, is that so? A. I still say I wouldn't say that. I don't recall.
Q. But you can't point to any record or anything that you can recall: you can't produce anything? A. Right."
He testified also that at this time the raid on Grube's place was under investigation by him because "we heard of some activity going on there." But the only notation he made on the police blotter was:

"11:35 P.M. Called 163 Morningside Avenue."
However, he said he only put there what he "felt should go in it," although just above this particular place on the blotter he wrote some fairly elaborate notes about the fall of a pedestrian on a sidewalk. He maintained that the practice was to make notes on yellow sheets carried with him and turn that report over to his superior, the police commissioner. This was done (he said) in connection with the Grube raid and the sheets were given to Sergeant Ably  the only other member of the force  who gave them to the commissioner.
The commissioner denied emphatically that he ever received any such report. Salimone did not call Ably as a witness to furnish corroboration.
According to Salimone, the next day John Trombetto appeared at the police department. He is the person in Bayonne to whom the telephone call had been made after the raid. The content of their conversation was not developed. *502 But at one point on cross-examination this question and answer were given:
"Q. Now, at the same trial, Mr. Salimone (referring to the misconduct indictment trial), were you asked this question: `Isn't it a fact that at the time you spoke to John you were told this crap game was protected by the county, which was October 20, 1949, and you did nothing about investigating that until you spoke with Mr. Brown in 1951?' And did you make this answer: `That is right.'? (Insertion ours) A. Yes, sir."
We do not pause to appraise the truthfulness of that testimony or its relation to his defense in the criminal misconduct trial. It is more important and relevant to note for purposes of this proceeding that Salimone did not arrest Trombetto or Grube or anyone else. Also, so far as the record shows, he made no investigation report about Trombetto to his superior or to anyone in authority. The matter seems to have ended there.
It was not until April 1951 when Salimone was under investigation by the Deputy Attorney-General who had been assigned to Bergen County and after he had appeared at least once before the grand jury, that the matter opened up again. At this time, after a conversation with Salimone, Chief William Beppler of the Washington Township Police Department arranged with Gordon H. Brown, Esq., an assistant to Deputy Attorney-General Stamler in the Bergen County investigation, to meet Salimone at his (Beppler's) home.
According to Brown at this meeting Salimone informed him about the raid of October 19, 1949 on the crap game at Grube's garage and how a man had been taken from the game to De Puy's home. He described how he followed and overtook this man and questioned him, although he did not obtain any identifying information from him. He told Brown that this unidentified person indicated that a crap game had been "set up" for that night in the garage. Salimone said he inquired as to the name of the "boss" and was given a telephone number which he wrote on his personal card. This card was turned over to Brown with the information that Salimone had called the number on the night of October 19 before *503 releasing the apprehended man. In the course of this call, Salimone said the person he was talking to agreed to come in the next day "to talk * * * about the game."
Brown testified further that the telephone number on Salimone's card eventually led to the arrest of a person who was charged with having "operated and set up" the game at Grube's. Apparently he was the same man Salimone had talked with at police headquarters the day after the raid.
The Commission did not make any specific findings with respect to charges 3 and 4. A general finding was made that guilt had not been established by the greater weight of the evidence. We cannot agree.
The evidence adduced here shows clearly that on October 19 and 20, 1949, facts came to Salimone's attention which should not have left any illusions in the mind of a reasonable man  to say nothing about a trained and experienced police officer  as to what was going on at Grube's garage. Salimone knew that persons had violated or had conspired to violate the gambling laws of the State as well as the pertinent ordinance of his municipality. Yet he made no arrests, no complaints and certainly no proper investigation. And in spite of all of the information that had come to his attention, he made neither formal report nor did he bring the matter to the attention of his superiors.
Such police work is so flagrantly worthless as to lead those passing judgment upon it to look for motive beyond mere indifference or stupidity. Thus any critical analysis of Salimone's conduct must result in a more favorable evaluation of Grube's testimony.
Salimone's statements that he was suspicious of De Puy and that there was bad feeling between them are in sharp contrast with his actions. If the statements were true, it seems more likely that his effort would be to expose the crime and the criminals rather than to prevent prosecution by concealing his proof. Nor is his situation bettered by the assertion that he was advised the day after the raid by one of those obviously connected with the gambling operation that the game was "protected by the county." For a police *504 officer to accept the word of a gambler that the county law enforcement authorities are protecting him, and on the strength thereof to discontinue investigative or enforcement efforts in his own municipality where the offense was committed, is inexcusable. His plain duty was to proceed with enforcement activities in Park Ridge and to bring to the attention of his superiors the claim of protection.
In our judgment, the greater weight of the evidence clearly points to delinquency on the part of this police chief and to guilt of conduct unbecoming an officer as well as of conduct subversive of good order and discipline in the police force, as alleged in the fourth specification.
His guilt of charge 3 is equally plain. Under the circumstances shown a report on the police blotter noting simply that a call had been made at 163 Morningside Avenue, Park Ridge, was of no value and savored of concealment.
If there had been an independent comprehensive report of the facts within his knowledge, a different situation would be presented. Our study of the proof convinces us that there was no such report. Consequently the notation actually made on the blotter would probably lead a reader to conclude that the matter was routine and trivial.
The second charge was one of conspiracy to aid bookmaking and requires an independent discussion of the facts.
Grube testified that in May 1950 he went to Salimone and suggested that he would like to rent his telephone to bookmakers. Salimone said he would see what could be done and later some men came in and looked over the room. His telephone had been disconnected because of non-payment of the bill. But after the examination of the premises, Salimone told him to go to "The Goody Shop" which was operated by his son-in-law, to pick up the money to satisfy the bill. He went there and received $40 in cash in an envelope which he took to the telephone company office and used to pay up his account.
Upon the resumption of service, three men arrived and fixed the room up for bookmaking operations. Thereafter they engaged in that activity for 18 days. Two of them were *505 brothers named Ferrara and the third was one Manny Streit. Subsequently Grube and Streit were tried and convicted, and Joseph Ferrara pleaded guilty on indictments resulting from this operation. State v. Salimone, 19 N.J. Super. 600, 603 (1952). Grube was sentenced to six months in the county penitentiary and served over four months.
Grube was to be paid $25 weekly for the use of the phone. A few days after the bookmaking began, he said Salimone paid him $10 in cash. The second week, he received $10, and the third, $15. Then the place was raided by county detectives. The deductions from the agreed weekly rental were to recapture the $40 advanced for the telephone bill. All of these payments were handed to him by Salimone.
Salimone denied completely any involvement in this affair and the Commission accepted his testimony. In our view, Grube's assertions, in spite of his earlier efforts before the grand jury to protect the chief, are more credible.
The son-in-law of Salimone was an extremely important witness. Grube asserted that he provided the cash to make possible the reinstallation of the telephone. Yet he was not produced as a witness and his absence was not explained. Such failure must militate against the defendant's testimony. Moreover, if there had been any doubt about the renewal of the telephone connection or the payment of the bill at the time in question, the records of the telephone company were subject to subpoena.
Grube and Salimone had known each other for many years. On occasion the older and apparently impoverished man had been loaned small sums of money by the chief, his wife and son-in-law. The record develops no convincing reason why Grube would turn on Salimone and accuse him of the activities described.
On this phase of the case also we are convinced that the evidence preponderates in support of the conclusion that the second charge was established.
Under the circumstances, the judgment of the Commission is reversed and the municipal order of dismissal of Salimone from the public service is reinstated.