BOROUGH OF PARK RIDGE, PLAINTIFF-RESPONDENT, v. ANTHONY J. SALIMONE, *ET AL.*, DEFENDANT-APPELLANT.

Argued January 30, 1956—Decided February 20, 1956.

30

31

*Mr. Julius E. Kramer* argued the cause for the defendant-appellant (*Messrs. Chandless, Weller & Kramer,* attorneys).

*Mr. George F. Losche* argued the cause for the respondent.

The opinion of the court was delivered by

VANDERBILT, C. J. The plaintiff appealed to the Appellate Division of the Superior Court from an order of the Civil

Service Commission reversing the action of the borough council in removing Anthony J. Salimone from his position as chief of police. The Appellate Division reversed the Commission's determination (36 *N. J. Super.* 485) and reinstated the municipal order removing the defendant. We granted the defendant's petition for certification (19 *N. J.* 539) to review the judgment of the Appellate Division.

The case presents two issues. The first is whether the evidence justifies the dismissal of Salimone. The second, a procedural question—whether the Civil Service Commission has the power to disregard the time fixed by statute for the taking of an appeal to it from the determination of a municipality and in its discretion to substitute therefor its own standard of a reasonable time—deals with very important concepts in our civil service law.

## I.

Salimone had been the chief of police of Park Ridge since 1929. On February 13, 1951, he was indicted by the Bergen County grand jury for conspiracy to make book upon the running of horse races in contravention of *R. S.* 2:119–1 (now *N. J. S.* 2A:98–1). Touching, as it did, upon the administration of his office, he was immediately suspended by the council of the municipality. About the same time Salimone was also named as a defendant in another indictment charging misconduct in office. This latter indictment, twice tried but both times ending in a disagreement of the jury, was ultimately dismissed *nolle prosequi,* and plays no real part in these proceedings.

On the trial of the bookmaking indictment, however, in October 1951, Salimone was convicted and appealed to the Appellate Division. Pending the determination of that appeal, the municipality prepared written charges of violations of the police ordinance and the rules of the Park Ridge police department and copies of the notice of hearing and of the written charges were served on December 19, 1951 on the defendant.

The charges are fully set forth and discussed in 36 *N. J. Super.* 485, 488–490, and it is sufficient here to note that the specifications generally charge misconduct in office based upon factual allegations of conduct unbecoming an officer and subversive of good order and discipline of the police force. Only one of the four specifications is based on the conviction itself; the other three relate in part to the acts involved in that indictment, *State v. Salimone,* 19 *N. J. Super.* 600 (*App. Div.* 1952), and in part to acts which antedated those acts and occurred on October 19, 1949.

The hearing on these charges by the borough council was held on December 19, 1951, and continued on December 26, 1951. On both occasions Salimone was present and was represented by counsel. No evidence was offered by Salimone in defense of the charges against him. The reason assigned for such action was that it might prejudice his appeal or the trial of other charges which were pending against him in the county criminal courts. He was found guilty on all counts and, by a resolution duly adopted by the borough council, was dismissed from the department.

Thereafter, a hearing *de novo* before the Civil Service Commission was granted by it to Salimone. On that hearing of the charges, inasmuch as the first charge dealt with the commission of a crime for which Salimone had been acquitted, that charge was properly dismissed. The Commission's minutes, however, which contain its opinion and decision in this case, show the cursory consideration given to the other charges against Salimone:

"With respect to charges Nos. 2, 3 and 4, the allegations contained therein present questions of fact to be determined by this Commission. It seems unnecessary to repeat at length the testimony of the witnesses in this case and it narrows down to the question of whether or not this Commission is willing to accept the testimony of the witness Grube as against that of the appellant. Mr. Grube gave what we would characterize as amazing testimony with respect to his relationship with the appellant. He indicated that Salimone made an arrangement with him and agreed to pay him, the witness Grube, certain moneys for the use of telephone and telephone equipment at the place where Grube lived, namely, 163 Morningside Avenue, Park Ridge. In pursuance of this so-called conspiracy or un-

lawful arrangement, bookmaking and betting was conducted at the premises. He also indicated in his testimony that Salimone had paid him certain sums of money, in all $35.00, for the use of his premises. Grube gave further testimony that he talked with Salimone in regard to renting his garage for the establishment therein of a gaming resort and that Salimone gave him certain sum of money for the use of the garage. Salimone was also charged with failing to make an entry in the Police Blotter and also with failing, as indicated by charge 4, to get information with respect to a dice game or gambling at the garage in the rear of premises 163 Morningside Avenue, Park Ridge.

This Commission has studied all of the testimony and it is our observation that the testimony offered on behalf of the Borough and especially that of the witness Grube is not at all convincing. All that he said was stoutly denied by the appellant and, as we review the proof, there is not sufficient in it, in our judgment, to lead us to the conclusion that the charges have been sustained.

A careful review of the entire record, including all of the testimony, the exhibits and the arguments of counsel, leads us to the conclusion that the factual questions must be decided in favor of the appellant. It is our opinion that the authorities of the Borough of Park Ridge have failed to sustain the charges with a greater weight of creditable proof, that their action in removing the appellant from his position was not justified and proper and that the appellant has sustained his appeal."

The Commission reversed the dismissal and ordered Salimone to be restored to his position as chief of police with full pay from the date of his original suspension, February 13, 1951.

██ We find, as did the Appellate Division, that the greater weight of the evidence so clearly pointed to the delinquency of Salimone, and to his guilt of conduct unbecoming an officer as well as conduct subversive of good order and discipline in the police force, as to permit of no such disposition as made by the Commission.

From the evidence adduced before the Commission we find the factual situation to be as follows:

Conrad Grube, a man 71 years of age in 1949, lived at premises 163 Morningside Avenue in Park Ridge for a period of over 25 years. The house is in an isolated section of the borough and appears to be of the type found in many suburban areas of post-World War I vintage. There is a garage in the rear of the premises which is separate from the

dwelling. Grube apparently lived on a small income or pension of about $45 a month. He had known Salimone for over 20 years and from time to time had borrowed money from him and members of his family. In October 1949, he testified that he asked Salimone for help in finding a means whereby he could earn some extra money. Following that conversation by a few days three men appeared at Grube's home and rented the garage for $50 a week. It was to be used for a "crap" game and at their request Grube painted the windows black and provided a table on which they could play. Salimone's patrol took him by Grube's house at least twice a day but said that he never noticed the black windows in the garage.

The surreptitious game ran for three nights. On October 19, 1949 it was raided by First Assistant Prosecutor Wallace DePuy and three county detectives. Grube, in bed at the time of the raid, on the request of one of the detectives came down to the garage. There were 12 or 15 men there, one of them being one of the three men who had hired the garage from Grube and who was running the game. The prosecutor's men took the names of the persons present and then First Assistant Prosecutor DePuy told them to get out of Park Ridge and not to come back. Strangely, no one was arrested.

At DePuy's order Salimone was called on the telephone. He was in the radio patrol car of the Park Ridge Police Department at the time. The message was transmitted to him and he arrived at the garage at about 11:35 P. M. Present were Grube, a person he later learned was a man by the name of Malfitano (which the defendant referred to as Mel Petano), and the prosecutor's men. When he asked "what was going on, * * * nobody answered." Salimone indicated that DePuy and the detectives walked out taking Malfitano with them. Salimone's inquiry to DePuy as to whether he was taking the man to the police station also went unanswered. Salimone testified that DePuy departed taking Malfitano with him in a car, and that being "suspicious" of DePuy he followed them. The car proceeded to DePuy's home, which also was in Park Ridge, and the occupants went

inside. Such conduct will come as no surprise to those who have followed the former first assistant prosecutor's record through the reported pages; *In re DePuy*, 10 *N. J.* 282 (1952). Salimone parked about two blocks away and waited. When he saw the man, Malfitano, come out and get into the car and drive away, Salimone says he followed him. On direct examination he indicated that he lost the car on the road. On cross-examination he indicated that he stopped the car, took the fellow's name, but could not recall it, that he did not write it on the police blotter, that he did not communicate his name to anybody in the Park Ridge Police Department. Salimone also testified that all he obtained from the apprehended man was the telephone number of the man's "boss," a Bayonne telephone number; that he telephoned to the number in Bayonne, found out the man's name but could not recall it, and told the party answering the telephone that he was going to hold his man under arrest until he was given certain information. Notwithstanding all this, he let the man go without getting his name, without getting the license number of the car, or any other information concerning the man. Salimone also testified that at the time of this raid by the county prosecutor's office on Grube's premises he, Salimone, had the place under investigation because he had heard that there was some clandestine activity going on there. However, the only notation he saw fit to make on the police blotter was "11:35 P. M., called 163 Morningside Avenue."

Salimone thereafter testified that the day following the raid a John Trombetto appeared at the police department in Park Ridge. He was evidently the person in Bayonne to whom the telephone call had been made by Salimone after the raid. In this connection Salimone admitted that he had testified in his trial on the misconduct indictment that when he spoke to Trombetto he was advised that the "crap" game was protected by the county. No arrests were made by Salimone. Trombetto, Malfitano and Grube were left unaffected by their unlawful conduct. No report of any kind was made to the police commissioner in connection with the events of this raid.

It developed from an investigation conducted in 1951 by the Deputy Attorney-General who had been assigned to "clean up" Bergen County that the telephone number Salimone called on October 19, 1949, which was turned over to the Attorney-General's men by Salimone at the time of that investigation, eventually led to the arrest of a person who was charged with having operated and set up the game at Grube's. This was apparently the same man Salimone had talked with at police headquarters the day after the raid.

After this incident in October 1949 there was a repetition of similar events in May 1950, when Grube told Salimone he would like to rent his telephone to bookmakers. Several days later some men came to see Grube and merely looked over the room in Grube's home. Thereafter, Salimone told Grube to go to "The Goody Shop" which was operated by Salimone's son-in-law and get money to pay his telephone bill so that the service which had been suspended because Grube had defaulted in payment of his bill could be restored. Grube, following instructions, received $40 in cash in an envelope at "The Goody Shop" and paid up his telephone account. When service was restored three men came to Grube's home and set up a room for bookmaking activities. This enterprise continued for 18 days before being raided. Grube and the three men were subsequently indicted and pleaded guilty or were convicted after trial.

Much of the damaging testimony against Salimone comes from the lips of Grube. Several things make it more credible than the protestations of innocence by Salimone. In the first place, Salimone's conduct in connection with the events of October 19, 1949 is so utterly contrary to what is expected of any diligent and honest police officer of his long experience as to reasonably lead us to suspect his testimony; secondly, Grube on a prior occasion before the grand jury made efforts to protect his police chief friend and there is nothing to indicate that there was now any motive for accusing Salimone falsely; thirdly, the inconsistencies in Salimone's tale when considered with his failure to call important witnesses such as his son-in-law, or to present important documentary evi-

dence such as the telephone company records which could strengthen his case, must be taken as adversely affecting his testimony.

The Appellate Division had the power to and, just as we are, was justified in making its own findings of fact in this case. Under *R. R.* 1:5–4(*b*) and *R. R.* 2:5 the Appellate Court is given power on a review of any cause involving issues of fact not determined by the verdict of a jury to make new or amended findings of fact. The only limitation on the exercise of this power is that due regard must be given to the opportunity of the trial court to judge the credibility of the witnesses before it. It is to be noted that the Commission did not make any specific findings with respect to the charges but contented itself with merely making a general finding that guilt had not been established by the greater weight of the evidence. For this it must be criticized. *Abbolt's Dairies, Inc. v. Armstrong,* 14 *N. J.* 319 (1954) ; *Household Finance Corporation v. Gaffney,* 11 *N. J.* 576 (1953) ; *In re Central R. Co. of N. J.,* 29 *N. J. Super.* 32 (*App. Div.* 1953) ; *Family Finance Corporation v. Gough,* 10 *N. J. Super.* 13 (*App. Div.* 1950).

"These findings are of the utmost importance not only in insuring a responsible and just determination by the Director, but also in affording a proper basis for effective judicial review." *Abbott's Dairies, Inc., v. Armstrong, supra,* 14 *N. J.,* at *page* 332.

If the Commission had taken the time to analyze the testimony in this case it could not possibly have reached the superficial and erroneous conclusion to reverse the borough council. The evanescent quality of the treatment given to the clear and convincing evidence is so contrary to what is indicated in this case as to make such result totally unreliable. That Salimone was recreant to his trust is the only conclusion that could be reached on the merits here. Although the jury may have felt that the proof was not sufficient to demonstrate his guilt beyond a reasonable doubt, it clearly indicated, by a preponderance of the credible evidence, his guilt of conduct unbecoming an officer and subversive to the good order and dis-

cipline of the police force. *Smith v. Carty,* 120 *N. J. L.* 335, 343 *(E. & A.* 1938).

## II.

Turning to the procedural aspects of this case, we find that this transgression on the part of the Commission could and should have been avoided by compliance with the commands of *N. J. S. A.* 11:2A–1, *R. S.* 11:15–4, *R. S.* 11:22–38, 39, 40. These statutes provide as follows:

*N. J. S. A.* 11:2A–1. "No employee of the State, or of any county, municipality or school district of the State shall be suspended, fined, demoted for a period of greater than thirty days in the aggregate in any one year or discharged without the same right of appeal to the commission, which shall have the same power of revoking or modifying the action of such authority, as in the case of removal as provided in sections 11:15–2 to 11:15–6 of the Revised Statute. No such employee shall be suspended, fined or demoted for a period greater than five days at one time without the same right of appeal, with the same authority in the commission as aforesaid."

*R. S.* 11:15–4. "Within thirty days after the receipt of such notice of removal from an appointing authority, the commission may, upon its own initiative, make such investigation as it may deem advisable, and upon the appeal of the removed employee, if such appeal is received within ten days from the date of such removal, it shall publicly inquire into and hear the person sought to be removed either sitting as a body or through one or more of its members."

*R. S.* 11:22–38. "No officer, clerk or employee holding a position in the competitive class shall be removed, discharged, fined or reduced, except as provided in *section* 11:22–6 of this title as to probationers, until he has been furnished with a written statement of the reasons for such action by the appointing authority and been allowed a reasonable time to make answer thereto. A copy of the statement or reasons therefor and the answer thereto, with the action of the appointing authority, shall forthwith be furnished to the commission and entered upon its records, and shall also be entered on the records of the department or office in which the removed, discharged, fined or reduced person was or is employed. The officer, clerk or employee shall at once be notified, in writing, of the action taken on such charges and answer. The action of the appointing authority ordering or directing such removal, discharge, fine or reduction shall not take effect until approved by order of the commission. If, however, such person so ordered or directed to be removed, discharged, fined or reduced shall not, within ten days after notification, as aforesaid, apply to the commission for an in-

vestigation of the charges on which such order of removal, discharge, fine or reduction is based, under such rules as the commission shall prescribe, such order may be approved, as of course, without hearing or investigation."

*R. S.* 11:22–39. "If the application mentioned in *section* 11:22–38 of this title is made within the time prescribed, the commission shall fix a time and place for a hearing of the case, of which time and place written notice shall be served upon the appointing authority and the officer, clerk or employee, at least five days prior to the hearing. The respective parties may, at the hearing, be represented by counsel. The commission shal hear witnesses and receive all competent evidence produced and may compel by subpoena the attendance of witnesses and the production of evidence. The commission shall determine the case upon the evidence presented. If the commission shall, on such hearing, disapprove of the order of removal, discharge, fine or reduction, such order so disapproved shall be of no effect."

*R. S.* 11:22–40. "The commission may, of its own motion, if in its opinion *section* 11:22–38 of this title has not, in the matter of such order for removal, discharge, fine or reduction, been fully complied with, or if an affidavit that they have been violated shall be presented, direct a hearing and approve or disapprove the order the same as if an application for investigation as provided by section 11:22–38 of this title had been made."

On December 26, 1951, the night of the dismissal by the borough council of Park Ridge, the borough clerk personally served upon Salimone a formal notice entitled: "Final Notice of Suspension, Fine, Demotion, Removal or other Disciplinary Action Affecting a Permanent Officer or Employee in the *Classified Civil Service.*" This notice was filed with the Department of Civil Service. All of these formalities were strictly in accord with the provisions of *R. S.* 11:15–3 and *R. S.* 11:22–38, and were required by reason of the fact that the Borough of Park Ridge has since the general election of 1938 elected to operate under the provisions of the civil service law. The defendant had been in the classified civil service for upwards of 13 years.

More than ten days later, on January 7, 1952, the Department of Civil Service wrote to the borough acknowledging receipt of the notice of dismissal and advised the borough that in the absence of any appeal by Salimone they were "recording" the borough's action in dismissing him from the police force.

■ Fourteen days after his dismissal Salimone, through his counsel, appealed to the Bergen County Court. There was no warrant whatsoever for this course. Consequently, the borough moved in the County Court to dismiss the appeal so taken on the ground that such court was without jurisdiction to consider, hear or determine the appeal. An order dismissing the appeal was properly entered on February 8, 1952. In the meantime counsel for the defendant, now being apprised of his error by the borough's moving papers, on February 4, 1952 wrote to the Civil Service Commission. The official minutes of the Civil Service Commission meeting of February 5, 1952 aptly record the plea made and the Commission's action thereon:

"Mr. Kramer states it is his understanding that Mr. Salimone was appointed as Chief of Police prior to the adoption of Civil Service by Park Ridge and in ignorance of the fact that Park Ridge had adopted Civil Service the appeal was taken to the County Court and further that motion has been made to dismiss the appeal on the ground that Civil Service was adopted in 1938, and he understands that under *R. S.* 11:22–38 jurisdiction lies with the Civil Service Commission, together with the power to investigate such dismissal. He feels that the facts are such as would warrant an investigation and a trial *de novo*, and although the application has not been made within ten days for such investigation he believes that the Commission has the power to order such investigation on its own initiative beyond the ten day period. It was *Voted, that the request for hearing be denied on the basis that the request was not received within the time prescribed in accordance with the provisions of R. S. 11:22–38 and R. S. 11:15–4.*" (Emphasis supplied)

This conclusion by the Commission leaves no room for speculation as to what the Commission then believed its power to be in connection with a request for a hearing (an appeal) by a discharged employee made after the time prescribed by statute had expired.

On February 18, 1952 Salimone's counsel, still bent on gaining relief for his client, and pursuant to the suggestion of some one in the Department of Civil Service given in a telephone conversation with him, filed his own affidavit reciting the facts of his mistaken appeal to the County Court and the pending appeal of the criminal conviction in the

Appellate Division. On the strength of his affidavit, prompted by the telephone suggestion, the Civil Service Commission without notice to and without knowledge on the part of the borough

"Voted, that a hearing be held in this case when the conviction from Mr. Salimone's appeal, which is presently before the Appellate Division of the New Jersey Superior Court, has been cleared."

On May 26, 1952 the Appellate Division reversed Salimone's conviction on the bookmaking charge and granted a new trial, see *State v. Salimone,* 19 *N. J. Super.* 600 (1952), because of a prejudicial error in refusing to admit evidence on behalf of the defendant of a prior contradictory statement of one of the State's witnesses. The Appellate Division was moved, however, in spite of the error requiring reversal, to observe that "there was plenary proof to support a finding of defendant's guilt of conspiracy to violate the bookmaking statutes," *Id.,* 19 *N. J. Super.* 605. On the retrial the jury returned a verdict of acquittal.

The Civil Service Commission heard Salimone's appeal on October 5, 1952, at which time the borough moved to dismiss the appeal because it had not been taken within the ten-day period as required by statute, and further on the ground that no notice had been given to it of the application of Salimone for reconsideration by the Commission of its previous dismissal and refusal to retain the appeal. These motions were denied by the Commission. In so doing the Commission took a position diametrically opposed to its previous action, inconsistently saying:

"The matter of granting a hearing on an appeal filed after the 10 day period is within the discretion of this Commission. * * *"

and that

"It has been the policy of the Civil Service Commission to accept notices of appeal as long as they are received within a reasonable time after removal * * *."

We have already discussed the result of this hearing before the Commission on the merits. We must now turn to a consideration of the Commission's procedural errors.

■ ■ In the first place, the Commission should not have undertaken to reverse its original action denying the defendant's appeal which was consistent with the requirements of the statute without first having given notice to the borough and an opportunity to be heard. As a *quasi*-judicial tribunal the Commission has inherent authority to reconsider its judicial acts, *Handlon v. Town of Belleville,* 4 *N. J.* 99 (1950), but the fundamental requirements of due process do not permit of such action without timely notice to the municipality and due hearing. *Id.,* 4 *N. J.,* at *page* 107. To do so is not only unfair but it would permit such proceedings to go on without end.

■ ■ But there are equally valid objections to the Commission's course of action stemming from a sound interpretation of the governing statutes. We must bear in mind that the primary object and the purpose of the civil service law is to secure for government, state, county and municipal, efficient public service in all its many functions. The welfare of the people as a whole, and not specifically or exclusively the welfare of the civil servant, is the basic policy underlying the law; *Sullivan v. Roe,* 18 *N. J.* 156, 162 (1955); *State Dept. of Civil Service v. Clark,* 15 *N. J.* 334 (1954); *Sullivan v. McOaker,* 84 *N. J. L.* 380, 385 (*E. & A.* 1913); *Walsh v. Department of Civil Service,* 32 *N. J. Super.* 39 (*App. Div.* 1954); *R. S.* 11:4–1; *Martini v. Civil Service Commission,* 129 *N. J. L.* 599, 602, 603 (*Sup. Ct.* 1943); and to effectuate that policy it has long been recognized that the statutes must be liberally construed; *Sullivan v. McOaker, supra; Walsh v. Department of Civil Service, supra; City of East Orange v. Civil Service Commission,* 132 *N. J. L.* 131 (*Sup. Ct.* 1944); *City of Newark v. Civil Service Commission,* 115 *N. J. L.* 26 (*Sup. Ct.* 1935). But a liberal policy of construction is still no license to disregard the clear meaning of the law as to the basic purpose sought to be accomplished by the statutes, and any doubt on this score must be resolved

in favor of the express provisions of the statutes; *Tanis v. Passaic County,* 126 *N. J. L.* 303 (*E. & A.* 1941); *Maguire v. Van Meter,* 121 *N. J. L.* 150 (*E. & A.* 1938); *City of Newark v. Civil Service Commission, supra.*

██ The statutes, as we have pointed out, give a classified civil servant the right to appeal to the Civil Service Commission from the action of the appointing authority, *N. J. S. A.* 11:2A–1; *R. S.* 11:15–4; *R. S.* 11:22–38, *supra.* In addition, the Commission itself also has the power "upon its own initiative" to make whatever investigation of the disciplinary action it deems advisable, *R. S.* 11:15–4, 5, 6, and "of its own motion" to direct a hearing of the charges, *R. S.* 11:22–40. But this power to act on its own motion is distinct and separate from an employee's right of appeal which we have been considering up to this point. As we have seen, the employee's appeal to the Commission must be "received within ten days from the date of such removal," *R. S.* 11:15–4. The Commission's action to investigate, on the other hand, may be taken by it in its discretion "within thirty days after the receipt of such notice of removal from an appointing authority." The distinction between the two processes is made very clear by a cursory reading of *R. S.* 11:15–5, 6.

By having the power granted under *R. S.* 11:15–4 and *R. S.* 11:22–40 to act independently and without regard to any appeal to it by a disciplined employee, the Commission can redress any attempts at subversion or evasion of the civil service law by appointing authorities and thereby insure the continuance of an effective public service.

Viewing these statutory provisions, as we must, as part of one body of consistent rules for the carrying out of the legislative policy and the protection of the rights of the civil service employee in furtherance of that policy, we cannot help but perceive the obvious—a design to give to the employee a period of ten days from the date of notification of his removal to exercise an absolute right of appeal, and to give the Civil Service Commission a period of 30 days from the time of its notification of such removal action to exercise its discretionary power to investigate the proceedings and

approve the action or order correction. It is also apparent
that *R. S.* 11:15–4, which expressly embodies the two periods
of time applicable, together with *R. S.* 11:15–5 and *R. S.*
11:15–6, provides for the same protective remedies that are
embodied in *R. S.* 11:22–38 to *R. S.* 11:22–40, inclusive.
*R. S.* 11:15–4 clearly indicates that within 30 days after
notice of the removal the Commission *may* in its discretion
initiate proceedings to inquire into such action, but it is
*obliged* to make such inquiry if an appeal to it by the removed
employee "is received within ten days" of the dismissal.

The ten-day period prescribed for action by the dis-
missed employee can admit of no construction other than that
it is mandatory in its requirement. *Weaver v. New Jersey
Dept. of Civil Service,* 6 *N. J.* 553, 558 (1951). This is not
a harsh rule, for coupled with it is the power given to the
Commission to entertain such proceedings after the expira-
tion of the employee's time to appeal and within 30 days
after notification to it, if in its discretion the facts and
circumstances require it. This prevents arbitrary foreclosure
of the remedy of the civil servant. But, the time must come
when the appointing authority can rely upon the conclusion
of the issue and proceed to make arrangements in the interest
of the public to replace the dismissed employee without fear
that its action will be undone. Not only does common prac-
tice require it, but the fundamental policy of the law demands
definite limitations. To this end Mr. Justice Heher, in
*Marjon v. Altman,* 120 *N. J. L.* 16 *(Sup. Ct.* 1938), at *page*
18, was compelled to note:

"\* \* \* the public interest requires that the protection accorded
by statutes of this class be invoked with reasonable promptitude."

Although the statutes there involved concerned tenure, the
principle is the same; see 145 *A. L. R.* 768, and the cases
collected under the subheading "New Jersey," *p.* 770; *Board
of Education of City of Garfield v. State Bd. of Education,*
130 *N. J. L.* 388 *(Sup. Ct.* 1943), and the cases cited in 36
*N. J. Super.* 494 under [3].

 We can see no logic in or reason for continuing the Commission's construction of these statutes that appeals may be accepted by the Commission as long as they are received within a reasonable time or that the ten-day period prescribed for action by the employee is merely directory. As Judge Francis properly pointed out below (36 *N. J. Super.* 435, 496):

"Under the new system, our courts have recognized the binding force—even the jurisdictional restriction—of a time limit imposed on the taking of appeals by the rules of practice. *In re Caruso's Will*, 18 *N. J.* 26 (1955) ; *In re Pfizer's Estate*, 6 *N. J.* 233 (1951) ; *Theresa Grotta Home [for Convalescents] v. Board of Adjustment*, 19 *N. J. Super.* 331 (*App. Div.* 1952). We find no justification for the adoption of a contrary rule in dealing with a statutory limitation on the right of appeal to an administrative agency. *Cf. Kasko v. State*, 34 *N. J. Super.* 222 (*App. Div.* 1955) ; *Lamastra v. Montgomery Ward & Co.*, 25 *N. J. Super.* 14 (*App. Div.* 1953) ; *Kolonkiewicz v. W. Ames & Co.*, 23 *N. J. Super.* 265 (*Cty. Ct.* 1952) ; *Fishman v. Fisch Hat Co.*, 16 *N. J. Misc.* 316 (*C. P.* 1938) ; *Rule* 59, *Civil Service Commission*. If hardship in a particular case consequent upon a failure to comply with the court rule did not provide a basis for relaxation of the rule, no different result is justifiable in a statutory proceeding. *In re Nuese's Estate*, 15 *N. J.* 149 (1954) ; *In re Pfizer's Estate, supra.*

Subsequent to the *Pfizer* case, the Supreme Court recognized that in some cases justice and equity might require extension of time for appeal within the court system. Consequently an amendment of the rule was promulgated which permits enlargement of the period, not to exceed 30 days, upon a showing of good cause by the applicant and absence of prejudice to his adversary. *R. R.* 1 :27B(2). If it is considered that the time for the statutory appeal to the Civil Service Commission is too restrictive, a remedy lies in the legislative domain."

*R. S.* 11 :22–38, as we have indicated, requires the approval by the Commission of the removal action by the appointing authority and, absent any appeal within the ten-day period by the employee, provides that the removal order *may* be approved, "as of course." No time limitation is there set forth as to when such approval must be given; nor is there any time limitation set forth in *R. S.* 11 :22–40 governing the discretionary power of the Commission "on its own motion" to hear and approve or disapprove the action "if in

its opinion *section* 11:22–38 of this title has not, in the matter of such order for removal * * * been fully complied with," or to proceed similarly if an affidavit is presented to it showing noncompliance with the due process provisions of *R. S.* 11:22–38. But in line with the policy of favoring a definite termination of proceedings, to enable the proper and efficient administration of the affairs of government, we must consider such action by the Commission as being limited to 30 days by the provisions of *R. S.* 11:15–4 which are *in pari materia.*

■ Unquestionably, the Commission has general supervisory power over all activities carried on under the civil service law. *N. J. S. A.* 11:1–6. It has the general power to enforce the provisions of the law and its own rules and regulations. *R. S.* 11:1–7(*d*), 7.1. It also has the general power to investigate matters pertaining to the enforcement and effect of *Title* 11 and the rules and regulations promulgated thereunder, and concerning the action of its own officers and any person in the paid employ of the State or any county, municipality or school district 'operating under the provisions of the law with respect to the execution of the requirements of the law, *R. S.* 11:1–16; *City of East Orange v. Civil Service Commission,* 132 *N. J. L.* 181, 183 (*Sup. Ct.* 1944). All of these powers are unaffected by any time limitation. But none of these general powers can be construed as nullifying or as liberalizing the specific provisions of the same law. The specific power granted to the Commission pursuant to *R. S.* 11:15–4 to investigate removals "upon its own initiative" is limited to 30 days from the date of receipt of notification of removal. This same power to investigate within the 30-day period has been extended by the provisions of *N. J. S. A.* 11:2A–1 to suspensions, fines, demotions and discharges, and there can be no question that the general supervisory powers of the Commission are so limited.

Assuming that the power granted to the Commission by *R. S.* 11:22–38 and 40 to investigate was truly discretionary and without any limitation as to time except reasonableness, as is contended, such a grant of power is not consistent with

the clear indication in *R. S.* 11:15–4 that the limitations are not merely directory and hence by virtue of *N. J. S. A.* 11:2A–1 were repealed (*L.* 1938, *c.* 76, *p.* 191, *sec.* 2; *L.* 1946, *c.* 184, *p.* 771, *sec.* 2).

 As between two possible constructions of a statute, the one which most closely effectuates legislative policy must control. *Moore v. Johnson,* 85 *N. J. L.* 40 (*Sup. Ct.* 1913); *State Dept. of Civil Service v. Clark,* 15 *N. J.* 334, 341 (1954). The discretionary power granted to the Commission was not as to the time within which to act but as to the act itself. Consequently, since no proceedings were effected by the Commission within 30 days from the date of notification to it, it was without authority to pass upon the propriety of the dismissal of Salimone.

 By notifying the Borough of Park Ridge on January 7, 1952 "that in the absence of an appeal we have recorded your action in dismissing Anthony J. Salimone," the Department of Civil Service was undoubtedly complying with the requirement of *R. S.* 11:22–38. The natural effect of such notice would be to lead the borough to believe that the dismissal was approved and that it could proceed to replace the chief of police free from any possible repercussion. In line with that, the Commission denied Salimone's application for leave to appeal made on February 5, 1952. If the contention of the appellant is sound, the borough was prejudiced by the subsequent action by the Commission in reversing its decision and granting the appeal. The appellant contends that upon the rendition of the decision by the Commission, Salimone became possessed of a vested right in the salary ordered to be restored to him as of the date of his original suspension, February 13, 1951, and could be deprived thereof only in accordance with the established principles of law. What the defendant has sought to have set aside for his benefit in his argument in favor of the propriety of the action by the Commission he now seeks to erect as a barrier against the conclusion by the Appellate Division. Suffice it to say that there was no more "vested right" in Salimone to the salary ordered to be paid by the Commission until after the

time of the borough to appeal from that decision had run than there was in the borough to rely upon its own decision until after the employee's time to appeal and the Commission's time to initiate proceedings independent thereof had run.

The judgment is, therefore, affirmed.

_For affirmance_—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

_For reversal_—None.