L. ARTHUR BURTON, LOUIS A. BENTON, EDMOND H. SHULER, AL L. TOTH, HERMAN TREPTOW, GEORGE SCHIELKE AND CITIZENS COMMITTEE FOR FIRE-ARMS LEGISLATION, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS, v. ARTHUR J. SILLS, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, AND COLONEL DAVID B. KELLY, SUPERINTENDENT OF STATE POLICE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued October 22, 1968—Decided December 16, 1968.

88

Mr. *William E. Ozzard* argued the cause for appellants.

Mr. *Arthur J. Sills,* Attorney General of New Jersey, argued the cause for respondents (*Mr. John W. Hayden, Jr.,* Assistant Attorney General, of counsel and on the brief; *Mr. Stephen L. Skillman* and *Mr. Samuel D. Bornstein,* Deputy Attorneys General, on the brief).

The opinion of the court was delivered by

JACOBS, J. The Law Division upheld the constitutionality of New Jersey's recently enacted "Gun Control Law" (*L.* 1966, *c.* 60; *N. J. S.* 2A:151–1 *et seq.*) and dismissed the plaintiffs' complaint attacking it. 99 *N. J. Super.* 516 (1967). The Appellate Division affirmed (99 *N. J. Super.* 459 (1968)) and the plaintiffs appealed to this Court as of right. *R. R.* 1:2–1(*a*).

The plaintiffs are three individuals associated with sportsmen's clubs in New Jersey, two gun dealers, and a corporation organized to promote the sports of shooting and marksmanship. They filed a complaint in lieu of prerogative writ naming the Attorney General and the Superintendent of State Police as defendants and seeking (1) a declara-

tion that Chapter 60 of the Laws of 1966 is unconstitutional and (2) an injunction against its enforcement. Chapter 60 amended previous regulatory provisions governing firearms and provided, *inter alia,* for the licensing of manufacturers, wholesalers and retail dealers, and for the issuance of permits and identification cards to purchasers. *N. J. S.* 2*A*:151–19. 24, 32. The complaint alleged that although the statute requires the sellers of firearms to comply with standards and qualifications prescribed by the Superintendent of State Police, it gives the Superintendent broad powers "without legislative direction or specification." *N. J. S.* 2*A*:151–19, 24. But the statute explicitly directs the Superintendent to prescribe standards and qualifications necessary for "the public safety, health and welfare"; this guideline, though general, is comparable to that set forth in many other State enactments and is, in its context, clearly sufficient. See *Ward v. Scott,* 11 *N. J.* 117, 122–128 (1952); *Elizabeth Federal S. & L. Ass'n v. Howell,* 30 *N. J.* 190, 194 (1959); *Moyant v. Borough of Paramus,* 30 *N. J.* 528, 552 (1959).

The complaint alleged that the statute requires a firearms purchaser to have an identification card issued by the local chief of police, or in certain instances by the Superintendent, according to stated standards but with a "general provision allowing wide discretion on the part of such officials and lacking legislative direction or specification." *N. J. S.* 2*A*:151–33. The statute provides that a pistol or revolver permit or a firearms purchaser identification card shall not be denied to any person of good character and good repute but that no such permit or identification card shall be issued to certain groups including minors under eighteen, convicted criminals, mental and physical defectives, narcotics addicts, habitual drunkards, etc. It also provides that no permit or identification card shall be issued "to any person where the issuance would not be in the interest of the public health, safety or welfare." At oral argument the Attorney General took the position, with which we agree,

that the quoted language was intended to relate to cases of individual unfitness, where, though not dealt with in the specific statutory enumerations, the issuance of the permit or identification card would nonetheless be contrary to the public interest. *Cf. State v. Neumann,* 103 *N. J. Super.* 83, 87 *(Monmouth County Ct.* 1968).

In the light of this narrowed construction, the statutory standard is undoubtedly sufficient to withstand attack. See *Ward v. Scott, supra; Elizabeth Federal S. & L. Ass'n v. Howell, supra; Moyant v. Paramus, supra.* The Legislature's goal was to keep guns out of the hands of unfit persons. To that end it disqualified certain classes which quickly come to mind. To guard against inadvertent omissions, it delegated authority to appropriately designated officials to disqualify any unfit individuals who, though not strictly within the enumerated classes, should not in the public interest be entrusted with firearms. To guard against arbitrary official action the Legislature directed early determination and provided for easy appeal to the county court *(N. J. S. 2A:*151–34). Review from the county court is readily available in the Appellate Division and, when necessary, in this Court. As has been pointed out elsewhere, these safeguards are probably of greater significance than further details in the statutory standard. See 1 *Davis, Administrative Law* § 2.15 (1958); *Department of Health, State of New Jersey v. Owens-Corning Fiberglas Corp.,* 100 *N. J. Super.* 366, 385 *(App. Div.* 1968); *Esso Standard Oil Co. v. Holderman,* 75 *N. J. Super.* 455, 474 *(App. Div.* 1962), *aff'd,* 39 *N. J.* 355 (1963), *appeal dismissed,* 375 *U. S.* 43, 84 *S. Ct.* 148, 11 *L. Ed.* 2d 107 (1963); *Gilman v. City of Newark,* 73 *N. J. Super.* 562, 596 *(Law Div.* 1962); see also *Matthews v. State,* 237 *Ind.* 677, 148 *N. E.* 2d 334, 335–37 (1958); Note, "Firearms: Problems of Control," 80 *Harv. L. Rev.* 1328, 1339 (1967).

█ ██ The complaint alleged that the statutory provisions for disqualification because of habitual drunkenness, nar-

cotics addiction, habitual use of goofballs or pep pills and mental disorder did not embody "any standards to guide the determination of officials charged with administration thereof." But the statutory terms are readily understandable and are comparable to those used in many other New Jersey enactments. See *Laba v. Newark Board of Education,* 23 *N. J. 364,* 384 (1954); *N. J. S. A.* 45:9–16; *N. J. S. A.* 45:4A–15; *N. J. S. A.* 33:1–39; *N. J. S.* 3A:6–42. None of the plaintiffs has been the subject of any of the stated disqualifications and this proceeding is not an appropriate one for further treatment of the particular terms in question. Similarly, it is not one for consideration of the validity of that portion of *N. J. S.* 2A:151–35 which sets forth that an applicant for a permit or identification card must state whether "he presently or ever has been a member of any organization, which advocates or approves the commission of acts of force and violence either to overthrow the Government of the United States or of this State, or which seeks to deny others their rights under the Constitutions of either the United States or the State of New Jersey." None of the plaintiffs suggests that he has been affected by this provision which is the subject of pending litigation directly addressed to it. See *Application of Marvin, Jr.,* 97 *N. J. Super.* 62 (*App. Div.* 1967). Under the circumstances it need not be dealt with here. In the main, we find present occasion for concerning ourselves with the plaintiffs' arguments addressed to the constitutionality of the statute as a whole rather than with the individual attacks on subordinate provisions. See *Grand Union Co. v. Sills,* 43 *N. J.* 390, 409–411 (1964). In general, those attacks should be dealt with on the basis of complete records in proceedings ripe for determination as in *Re Marvin, supra;* in all events, the attacks on the subordinate provisions would be subject to the doctrine of severability. *N. J. S.* 2A:151–57.2; *Angermeier v. Sea Girt,* 27 *N. J.* 298, 311 (1958).

We come now to the several points advanced in the plaintiffs' brief in support of their ultimate position that the Gun Control Law is basically unconstitutional and should be stricken in toto. In their first point they assert that Chapter 60 "fails in its alleged public purpose and thus must fall under the weight of the private rights it infringes upon." The public purpose of the statute is entirely evident; it is designed to prevent criminals and other unfit elements from acquiring firearms. Towards that end the Legislature has set up permit and identification requirements and has provided for disqualifications along with suitable inquiry into qualifications and fitness. In setting its course, the Legislature was undoubtedly aware of the strongly expressed views of the many enforcement officials who have long favored state and federal regulation of the sale and possession of firearms, and of the many disastrous consequences which have resulted from the widespread absence heretofore of such regulation. Illustratively, the Director of the Federal Bureau of Investigation, in supporting gun control laws, recently pointed out that in virtually every murder of a law enforcement officer, a firearm is the instrument of death; and while he acknowledged that hardened criminals would frequently obtain guns in disregard of control laws, he noted that their acquisition would be more difficult, and that, in any event, a large percentage of the murders in the United States occur "within the family or among acquaintances" where the free availability of the lethal firearm is undoubtedly "a major factor." Wholly apart from the dangers which arise when firearms are in the hands of criminals, there is the undoubted danger when they are in the hands of the immature or the unfit such as the mentally deranged, the addicted and the alcoholic. Chapter 60 is explicitly designed to keep firearms from all such persons whose possession would pose a threat to the public health, safety or welfare. The homicides which occur within the family or among acquaintances, to which the Director referred, often involve highly emotional alterca-

tions which would not result in death if a firearm were not ready at hand; and surely the hurried purchase of a firearm following an altercation would be prevented with the ensuing cooling off period entailed by the processing necessities of the statute. *See* Zimring, "Is Gun Control Likely to Reduce Violent Killings?", 35 U. Chi. L. Rev. 721 (1968).

■ The plaintiffs do not question the legitimacy of the legislative objective but urge that it will not be attained by the Gun Control Law and that the arguments against the Law outweigh those advanced in its favor. They point out that rifles and shotguns, which represent their main concern, accounted for but a small percentage of past homicides, though these notably included political assassinations, killings of enforcement officers, and snipings during riots. And they urge that, as a practical matter, the Law will not prevent hardened criminals from obtaining firearms while it imposes restrictions on those engaged in lawful and favored pursuits including hunting, target shooting, civilian small arms marksmanship training under Army programs, etc. The restrictions referred to are not prohibitions but are regulatory requirements entailing minor inconveniences which members of our society must accept and bear in the public interest. *See* 99 *N. J. Super.*, at 461–462; *Grimm v. City of New York*, 56 *Misc. 2d* 525, 289 *N. Y. S. 2d* 358, 362 (*Sup. Ct.* 1968). The fact that some criminals may, despite the Law, still be able to obtain firearms does not at all negate the validity of the conscientious legislative efforts aimed at keeping firearms out of the hands of all dangerously unfit persons, noncriminal as well as criminal. *See People ex rel. Darling v. Warden of City Prison*, 154 *App. Div.* 413, 139 *N. Y. S.* 277, 286 (*Sup. Ct.* 1913).

■■ The plaintiffs urge that the statute, insofar as it places regulatory restrictions on the ownership of firearms by sportsmen, tends to "depress the economic, sociological, and political forces supporting the conservation and wise use of our national resources"; in particular they assert that a

depression in recreational shooting activities will bring about "a decrease in the federal funds available for waterfowl management; a decrease in funds available to State game agencies for wildlife conservation and management; and a decrease in the funds available to privately sponsored wildlife conservation organizations." We find it difficult to envision that any such consequences will result from the Law's actual operation but, in any event, are entirely satisfied that this argument of the plaintiffs, along with the others embraced within their first point, are matters of legislative rather than judicial concern. The arguments bear on the wisdom of the legislation rather than on its validity. Presumably they were all weighed by the Legislature when it concluded that the Law would further the public interest and should be adopted. We do not sit here as a superlegislature and we accept the legislative judgment as to the wisdom of the statute. *See New Jersey Chapter, American Institute of Planners v. New Jersey State Board of Professional Planners,* 48 *N. J.* 581, 609 (1967), *appeal dismissed,* 389 *U. S.* 8, 88 *S. Ct.* 70, 19 *L. Ed. 2d* 8 (1967). Similarly we honor the presumption of constitutionality which attends all legislation (*see Hudson County News Co. v. Sills,* 41 *N. J.* 220, 227 (1963), *appeal dismissed,* 378 *U. S.* 583, 84 *S. Ct.* 1914, 12 *L. Ed. 2d* 1036 (1964) ; *Fried v. Kervick,* 34 *N. J.* 68, 74 (1961)) and the doctrine that factual support for the legislative judgment will be presumed and, absent a sufficient showing to the contrary, it will be assumed that the statute rested "upon some rational basis within the knowledge and experience of the Legislature." *Reingold v. Harper,* 6 *N. J.* 182, 196 (1951) ; *United States v. Carolene Products Co.,* 304 *U. S.* 144, 152, 58 *S. Ct.* 778, 82 *L. Ed.* 1234, 1241 (1938).

We find no merit in the plaintiffs' first point and deal now with their next point under which they urge that Chapter 60 is violative of the second amendment of the United States Constitution. That amendment reads as follows: "A

well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Its history and purpose have been detailed elsewhere and need only be summarized here. *See* Emery, "The Constitutional Right To Keep And Bear Arms," 28 Harv. L. Rev. 473 (1915); Brabner-Smith, "Firearm Regulation," 1 Law & Contemp. Prob. 400 (1934); Rohner, "The Right to Bear Arms: A Phenomenon of Constitutional History," 16 Catholic Univ. L. Rev. 53 (1966); Feller and Gotting, "The Second Amendment: A Second Look," 61 Nw. U. L. Rev. 46 (1966); *see also Bakal, The Right to Bear Arms,* 294 (1966).

The common law did not recognize any absolute right to keep and bear arms; that much is conceded by the plaintiffs who cite the Statute of Northampton, 2 Edw. III, c. 3 (1328), which declared that no man should "go nor ride armed by night or by day in fairs, markets, nor in the presence of the justices or other ministers" etc. *See* Emery, *supra,* 28 Harv. L. Rev., at 473; *see also Knight's Case, 3 Mod. Rep.* 117, 87 *Eng. Rep.* 75 (*K. B.* 1686). And though the English Bill of Rights of 1689 was aimed at certain abuses which included the disarming of Protestants while others remained armed, its history and terms make it clear that its reference to the right of Protestants to have arms was "a class right rather than an individual right" and that "individual self-defense was not within its protective purpose." Feller and Gotting, *supra,* 61 *Nw. U. L. Rev.,* at 48. Indeed the right of Protestants to have arms was expressed to be "as allowed by law" and current English statutes place very stringent controls on the availability of arms; Feller and Gotting note that "for all practical purposes the average citizen cannot lawfully obtain firearms in Great Britain at the present time." 61 Nw. U. L. Rev., at 49.

During the American colonial days there was great fear of military rule; the colonists believed that standing armies were acceptable only in extraordinary circumstances and

under control of civil authorities, and that the Militia was the proper organ for defense of the individual States. When the Constitution was adopted, it expressly granted to Congress the power to provide for calling forth the Militia to execute the laws, suppress insurrections and repel invasions, along with the power to provide for organizing the Militia and for governing such part as may be employed in the service of the United States, "reserving to the States respectively, the appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." Art 1, § 8, clauses 15 and 16. With their historic distrust of standing armies and the desire that the Militia be protected from federal encroachment, the States quickly obtained the adoption of the second amendment. As the language of the amendment itself indicates it was not framed with individual rights in mind. Thus it refers to the collective right "of the people" to keep and bear arms in connection with "a well-regulated militia." Most students of the subject would undoubtedly express agreement with the substance of the currently expressed view that "the term 'well-regulated militia' must be taken to mean the active, organized militia of each state, which today is characterized as the state National Guard." Feller and Gotting, *supra,* 61 Nw. U. L. Rev., at 64; *see N. J. S.* 38A :1–2, 3.

The plaintiffs acknowledge that the following federal cases which they cite are generally opposed to their contention that Chapter 60 is invalid under the second amendment, but they urge that "a reinterpretation of the effect of the Second Amendment upon the States is due to be made and the time is now with the New Jersey Statute to be the basis for reinterpretation." *United States v. Cruikshank,* 92 *U. S.* 542, 23 *L. Ed.* 588 (1876) ; *Presser v. Illinois,* 116 *U. S.* 252, 68 *S. Ct.* 580, 29 *L. Ed.* 615 (1886) ; *Miller v. Texas,* 153 *U. S.* 535, 14 *S. Ct.* 874, 38 *L. Ed.* 812 (1894) ; *United States v. Miller,* 307 *U. S.* 174, 59 *S. Ct.* 816, 83 *L. Ed.* 1206 (1939) ; *Cases v. United States,* 131 *F. 2d* 916 (1st

*Cir.* 1942), *cert. denied,* 319 *U. S.* 770, 63 *S. Ct.* 1431, 87 *L. Ed.* 1718 (1943) ; *United States v. Tot,* 131 *F. 2d* 261 (*3rd Cir.* 1942), *rev'd on other grounds,* 319 *U. S.* 463, 63 *S. Ct.* 1241, 87 *L. Ed.* 1519 (1943).

In *Cruikshank* the defendants were convicted in a lower federal court of conspiring to deprive certain freedmen of their right to bear arms, allegedly guaranteed them under the second amendment. In reversing, the Supreme Court noted that the right to bear arms was not one created by or dependent upon the federal constitution and that the second amendment meant "no more than it shall not be infringed by Congress." 92 *U. S.,* at 553, 23 *L. Ed.,* at 591–592. In *Presser* the defendant was convicted under a state statute which provided that it shall be unlawful for any body of men, other than the state's "regular organized volunteer militia" and the troops of the United States, to associate themselves as a military organization or drill with arms, without the license of the Governor. The conviction was sustained in an opinion which expressed the view that the statute did not "infringe the right of the people to keep and bear arms" and which reaffirmed the holding of *Cruikshank* to the effect that the second amendment was inapplicable because it related only to congressional action. 116 *U. S.,* at 264–265, 68 *S. Ct.,* at 584, 29 *L. Ed.,* at 618–619. In *Miller v. Texas* the defendant contended that a state statute which prohibited the carrying of a dangerous weapon on the person, infringed his rights as a citizen and was violative of the second amendment. The Supreme Court found no infringement of his rights and cited *Cruikshank* with full approval. 153 *U. S.,* at 538, 14 *S. Ct.* 874, 38 *L. Ed.,* at 813.

In *United States v. Miller, supra,* the defendant was convicted of the interstate transportation of a shotgun having a barrel of less than eighteen inches, in violation of the National Firearms Act of 1934. In upholding the conviction, the Supreme Court rejected a defense under the second

amendment, noting that there was no evidence indicating that possession of such a shotgun had "reasonable relationship to the preservation or efficiency of a well regulated militia." 307 *U. S.*, at 178, 59 *S. Ct.*, at 818, 83 *L. Ed.*, at 1209. The implication that such evidence might have led to a different result has been criticized elsewhere but need not detain us. *See Cases v. United States, supra,* 131 *F. 2d,* at 992; Feller and Gotting, *supra,* 61 *Nw. U. L. Rev.*, at 65–66. It is sufficient here to suggest that under *Miller,* Congress, though admittedly governed by the second amendment, may regulate interstate firearms so long as the regulation does not impair the maintenance of the active, organized militias of the states.

In *United States v. Tot, supra,* Judge Goodrich pointed out that, unlike the first amendment which provides for protection of free speech and freedom of religion, the second amendment "was not adopted with individual rights in mind, but as a protection for the States in the maintenance of their militia organizations against possible encroachments by the federal power"; in upholding the federal regulation against the interstate shipment of firearms to persons convicted of crimes of violence, he had this to say on behalf of himself and his colleagues:

Weapon bearing was never treated as anything like an absolute right by the common law. It was regulated by statute as to time and place as far back as the Statute of Northampton in 1328 and on many occasions since. The decisions under the State Constitutions show the upholding of regulations prohibiting the carrying of concealed weapons, prohibiting persons from going armed in certain public places and other restrictions, in the nature of police regulations, but which do not go so far as substantially to interfere with the public interest protected by the constitutional mandates. The Federal statute here involved is one of that general type. One could hardly argue seriously that a limitation upon a privilege of possessing weapons was unconstitutional when applied to a mental patient of the maniac type. The same would be true if the possessor were a child of immature years. In the situation at bar Congress has prohibited the receipt of weapons from interstate transactions by persons who have previously, by due process of law, been shown to be aggressors against society. Such a classification is en-

tirely reasonable and does not infringe upon the preservation of the well regulated militia protected by the Second Amendment. 131 *F. 2d* at 266–267.

*See also United States v. Adams,* 11 *F. Supp.* 216, 218–219 (*S. D. Fla.* 1935).

The plaintiffs venture the prediction that, notwithstanding all of the foregoing, the Supreme Court will hereafter "extend the restrictions of the Second Amendment to all of the States" as it has done with some other amendments in the Bill of Rights. Enough has been said to differentiate the second amendment from those which protect individual rights and, as such, have been carried over into the fourteenth amendment. *See* Cushman, "Incorporation: Due Process and the Bill of Rights," 51 Cornell L. Q. 467 (1966); Henkin, "'Selective Incorporation' in the Fourteenth Amendment," 73 Yale L. J. 74 (1963). However, the matter need not be pursued, for as the decisions indicate, regulation (such as New Jersey's Gun Control Law) which does not impair the maintenance of the State's active, organized militia (*see N. J. S.* 2A:151–43) is not at all in violation of either the terms or purposes of the second amendment or Art. 1, § 8, clauses 15 and 16. *See United States v. Miller, supra,* 307 *U. S.* 174, 59 *S. Ct.* 816, 83 *L. Ed.* 1206; *Cases v. United States, supra,* 131 *F. 2d* 916; *United States v. Tot, supra,* 131 *F. 2d* 261; *cf. Presser v. Illinois, supra,* 116 *U. S.* 252, 6 *S. Ct.* 580, 29 *L. Ed.* 615; *Dunne v. People,* 94 *Ill.* 120 (1879); *City of Salina v. Blaksley,* 72 *Kan.* 230, 83 *P.* 619, 3 *L. R. A., N. S.* 168 (1905); *Biffer v. City of Chicago,* 278 *Ill.* 562, 116 *N. E.* 182 (1917).

Long before the enactment of its recent Law (*L.* 1966, ·c. 60), New Jersey had many statutory provisions imposing restrictions not only on the carrying but also on the possession and sale of designated firearms. *See N. J. S. A.* 2:176–1 *et seq.* To the extent they were challenged they were readily sustained. *See, e. g., State v. Angelo,* 3 *N. J. Misc.*

1014 (*Sup Ct.* 1925) where the court, in upholding a concealed weapon conviction, stated that, in the exercise of its police power the State could impose "such conditions precedent to the right to carry concealed weapons as the safety and welfare of the people of the state in its judgment require." 3 *N. J. Misc.,* at 1015. There are comparable decisions in other jurisdictions which, like New Jersey, have no express state constitutional provisions dealing with the right to bear arms. *See Biffer v. City of Chicago, supra,* 278 *Ill.* 562, 116 *N. E.* 182; *State v. Rheaume,* 80 *N. H.* 319, 116 *A.* 758 (1922); *Ex Parte Rameriz,* 193 *Cal.* 633, 226 *P.* 914, 34 *A. L. R.* 51 (1924); *Hardison v. State, Nev.,* 437 *P. 2d* 868 (1968); *cf. People ex rel. Darling v. Warden of City Prison, supra,* 154 *App. Div.* 413, 139 *N. Y. S.* 277; *Grimm v. City of New York, supra,* 56 *Misc. 2d* 525, 289 *N. Y. S. 2d* 358. Even in those jurisdictions which have such express state constitutional provisions, the courts have found little difficulty in upholding varying and extensive statutory firearms regulations. *See State v. Dawson* 272 *N. C.* 535, 159 *S. E. 2d* 1 (1968); *State v. Robinson,* 217 *Or.* 612, 343 *P. 2d* 886 (1959); *Mason v. State,* 39 *Ala. App.* 1, 103 *So. 2d* 337 (*Ct. App.* 1956), *aff'd,* 267 *Ala.* 507, 103 *So. 2d* 341 (1958), *cert. denied,* 358 *U. S.* 934, 79 *S. Ct.* 323, 3 *L. Ed. 2d* 306 (1959); *People v. Brown,* 253 *Mich.* 537, 235 *N. W.* 245, 82 *A. L. R.* 341 (1931); *McIntire v. State,* 170 *Ind.* 163, 83 *N. E.* 1005 (1908); *City of Salina v. Blaksley, supra,* 72 *Kan.* 230, 83 *P.* 619, 3 *L. R. A., N. S.,* 168; *Dabbs v. State,* 39 *Ark.* 353, 43 *Am. Rep.* 275 (1882); *Rohner, supra,* 16 *Catholic U. L. Rev.,* at 70–77; Note, *supra,* 114 *U. Pa. L. Rev.,* at 553; *see also Robertson v. Baldwin,* 165 *U. S.* 275, 281–282, 17 *S. Ct.* 326, 41 *L. Ed.* 715, 717 (1897).

We have no hesitancy in rejecting the plaintiffs' point grounded on the second amendment and come now to point three of their brief which urges that Chapter 60 is violative of "Amendments I, IV, V, IX and XIV and Article

1, Secs. 8 and 10 of the United States Constitution." Under
this point the plaintiffs address their main attack to that por-
tion of *N. J. S.* 2*A* :151–35 which is dealt with in the pend-
ing litigation in *Re Marvin, supra,* 97 *N. J. Super.* 62 and
which, as we have already stated, is not an appropriate sub-
ject for treatment here. The plaintiffs also attack other por-
tions of *N. J. S.* 2*A* :151–35 which require fingerprinting and
call upon the applicant to set forth his physical character-
istics, whether he has been treated for mental condition,
whether he is an alcoholic, drug addict, etc. Earlier in this
opinion we expressed our belief that these provisions ought
not be dealt with individually in this proceeding; in general,
they appear on their face to be reasonably related to the
valid statutory objective and nothing in the record now
before us would impair their settled attendant presumption
of reasonableness. *See New Jersey Chapter, American Insti-
tute of Planners v. New Jersey State Board of Professional
Planners, supra,* 48 *N. J.* 581. The State's police power is
admittedly a comprehensive one and may be invoked by the
Legislature whenever it deems it necessary for the protec-
tion of the public health, safety, morals or general welfare.
*Reingold v. Harper, supra,* 6 *N. J.,* at 194; *Fried v. Kervick,
supra,* 34 *N. J.,* at 74. In our State, as elsewhere, the general
welfare concept has received broad definition. *Pierro v.
Baxendale,* 20 *N. J.* 17, 28 (1955). Even when it deals
with ordinary essential commodities, the Legislature has
power to adopt appropriate regulatory provisions; surely
when it deals with dangerous articles such as firearms, it
has comparable power with very broad sweep. *See Grand
Union Co. v. Sills, supra,* 43 *N. J.,* at 403–404.

The final statutory reference in point three of the plain-
tiffs' brief is to *N. J. S.* 2*A* :151–3. That section provides
that "any person who loans money secured by mortgage,
deposit or pledge of a pistol or revolver is guilty of a mis-
demeanor and shall be punished by a fine of not more than
$500, or by imprisonment for not more than 1 year, or

both." It was contained in Chapter 321 of the Laws of 1927 and was not in anywise altered by Chapter 60 of the Laws of 1966. It may originally have been aimed primarily at pawn-brokers but the plaintiffs suggest that its terms would pro-hibit a bona fide transaction in which a gun dealer seeks to borrow money from a bank on the security of his entire inventory including pistols and revolvers. The plaintiffs' complaint did not address itself to *N. J. S. 2A*:151–3 and so far as appears none of the plaintiffs contemplates any transaction which might fall within its terms. The lower courts did not deal with the matter and the briefs before us do not discuss the statutory history or purpose; under the circumstances, we shall refrain from further discussion of it here. *See Handbook of the National Conference of Com-missioners on Uniform State Laws and Proceedings* 894–895 (1927).

In their fourth point the plaintiffs contend that the dis-closure requirements which are really at the heart of Chapter 60, violate the fifth amendment's privilege against self-incrimination. They place reliance on *Haynes v. United States,* 390 *U. S.* 85, 88 *S. Ct.* 722, 19 *L. Ed. 2d* 923 (1968) where the defendant, after his claim of privilege was rejected, had pleaded guilty to the knowing possession of a sawed-off shotgun which had not been registered as required by § 5841 of the National Firearms Act. In holding that the claim of privilege should have been honored and that the defendant's conviction must be set aside, the Court noted that the questions propounded by § 5841 were " 'directed at a highly selective group inherently suspect of criminal activities'; they concern, not 'an essentially noncriminal and regulatory area of inquiry,' but 'an area permeated with criminal stat-utes.' " 88 *S. Ct.,* at 731, 19 *L. Ed. 2d,* at 933. In contrast, Chapter 60 is clearly regulatory and its inquiry is designed to keep firearms out of the hands of the unfit rather than to enmesh them in criminal prosecutions; it does not impose any registration requirements comparable to those in *Haynes.*

In *Grimm v. City of New York, supra,* the court, distinguishing *Haynes,* recently noted that New York City's Gun Control Law, which it upheld in full, was "regulatory in nature" and was "not aimed at persons inherently suspect of criminal activities." 289 *N. Y. S. 2d,* at 364.

In *Haynes* the Court, though sustaining the privilege, did not strike any provision of the Act; clearly the present proceeding is not one in which any striking is called for. None of the plaintiffs has asserted his own privilege against self-incrimination which is, of course, personal in nature. *See State v. Toscano,* 13 *N. J.* 418, 423 (1953). It may well be that no other individual will hereafter assert the privilege. If perchance one does in the course of the administration of Chapter 60, the issue may readily be dealt with, provided it is raised in an appropriate case on an adequate record rather than in academic fashion. For present purposes we need do nothing more than reject the plaintiffs' fourth point insofar as it seeks a declaration that Chapter 60 and its disclosure requirements are invalid on their face.

In their fifth and final point, the plaintiffs urge that the restraints and restrictions in Chapter 60 "exceed any claimed regulatory powers of the state and constitute a partial abolition of a basic right." We find no substance at all to this contention. The plaintiffs cite cases such as *Grosjean v. American Press Co.,* 297 *U. S.* 233, 56 *S. Ct.* 444, 80 *L. Ed.* 660 (1936), and *Near v. Minnesota,* 283 *U. S.* 697, 51 *S. Ct.* 625, 75 *L. Ed.* 1357 (1931) which have no bearing here. In *Grosjean* the Court struck down an infamous attempt to control Louisiana newspapers by the imposition of a gross receipt license tax on newspapers having a designated circulation (*see City of Absecon v. Vettese,* 13 *N. J.* 581, 585–586 (1953)); and in *Near* the Court struck down a state statute which authorized the suppression of offending newspapers through injunctive proceedings. The Constitution's acknowledged abhorrence of prior restraints

on the press surely has no relevance to reasonable restraints on the acquisition of dangerous items such as firearms. Our law contains an abundance of valid licensing provisions which have been enacted in furtherance of the public welfare; these include throughgoing fiitness requirements such as those which relate to the learned professions and to various trades, occupations and activities. *See* 99 *N. J. Super.,* at 462; *Grand Union Co. v. Sills, supra,* 43 *N. J.,* at 403–404; *Belleville Chamber of Commerce v. Town of Belleville,* 51 *N. J.* 153, 158 (1968).

New Jersey's Gun Control Law is highly purposed and conscientiously designed toward preventing criminal and other unfit elements from acquiring firearms while enabling the fit elements of society to obtain them with minimal burdens and inconveniences. The plaintiffs themselves admit the need for some "firearms legislation" and, in the concluding paragraph of their brief, they explicitly acknowledge their recognition of "the problems created by the availability of handguns to juveniles, criminals, and irresponsible persons through mail order purchases." It is indeed difficult to understand why their recognition does not quickly carry over into the equally serious and perhaps greater problems created through the free availability by direct purchase of pistols, rifles and other types of firearms. The plaintiffs predict that New Jersey's Law will not achieve its purpose but are unwilling to await the actual results of its operation over a reasonable period of time. They suggest deficiencies in the Law but instead of gearing their attack towards elimination of the deficiencies and the strengthening of the Law, they apparently would scrap the entire regulatory program. They complain about administrative delays which may already have been eliminated and, in any event, may hereafter readily be dealt with administratively. And they express their resentment against the statutory requirements such as fingerprinting, though fingerprinting is now customary for identification purposes in noncriminal fields and does not carry any "odium of bygone days." 99 *N. J. Super.,* at 461.

All in all, the plaintiffs' presentation, while indicating some inconvenience and intrusion into the total privacy they seek to retain, has not established any constitutional infirmity or the deprivation of any basic right. Reasonable gun control legislation is clearly within the police power of the State and must be accepted by the individual though it may impose a restraint or burden on him. On balance, the interests of the State are manifestly paramount, and while New Jersey's comprehensive efforts may not prove to be wholly successful until suitably joined by other jurisdictions, they will undoubtedly have advanced the public welfare by having led the way. *See* 99 *N. J. Super.,* at 462; *Administrative Code of City of New York* §§ 436–6.0 to 436–6.16 (*Grimm v. City of New York, supra,* 56 *Misc.* 2d 525, 289 *N. Y. S.* 2d 358); *cf.* Gun Control Act of 1968, Public Law 90–618, 90th Cong., H. R. 17735 (October 1968), amending 18 *U. S. C. c.* 44 and 26 *U. S. C. c.* 53. We agree with the holding of constitutionality below and, accordingly, the judgment of the Appellate Division is:

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.