711 A.2d 890

COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, APPEL-
LANT–RESPONDENT, v. NEW JERSEY DEPARTMENT OF
PERSONNEL, RESPONDENT–APPELLANT.

Argued October 6, 1997—Decided May 11, 1998.

122

*Lewis A. Scheindlin,* Deputy Attorney General, argued the cause for respondent–appellant (*Peter Verniero,* Attorney General of New Jersey, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

*Steven P. Weissman* argued the cause for appellant–respondent (*Weissman & Mintz,* attorneys; *Mr. Weissman* and *Judiann Chartier,* on the brief).

*Steven S. Glickman* submitted a brief on behalf of amicus curiae New Jersey Conference of Mayors (*Ruderman & Glickman,* attorneys).

*Gerald L. Dorf* submitted a brief on behalf of amicus curiae New Jersey State League of Municipalities (*Dorf & Dorf,* attorneys; *Mr. Dorf* and *Sandro Polledri,* on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

Pursuant to *N.J.S.A.* 11A:2–11i (Section 11i), the Commissioner of Personnel (the Commissioner) initiated two pilot programs for determining the eligibility of candidates for civil service appointments. The first program increased the number of eligible candidates from three to ten, and the second extended working test periods from four to twelve months. On the appeal of the Communications Workers of America (CWA) under *Rule* 2:2–3(a)(2), the Appellate Division declared that the programs exceeded the Commissioner's statutory authority. 299 *N.J.Super.* 166, 690 *A.2d* 695. We granted the Department of Personnel's petition

for certification, 151 *N.J.* 75, 697 *A.*2d 547 (1997), and reverse the judgment of the Appellate Division.

I.

In 1994 and 1995, the Commissioner held public hearings on the State's civil service system. Based on these hearings, the Commissioner, on November 27, 1995, announced plans for the institution of two state-wide pilot programs under Section 11i, which provides:

> In addition to other powers and duties vested in the commissioner by this title or any other law, the commissioner . . ʻ. [m]ay establish pilot programs and other projects for a maximum of one year outside of the provisions of this title.

The proposed programs departed from provisions of the Civil Service Act (Act), *N.J.S.A.* 11A:1–1 to 12–6. Ordinarily, a civil service employer's selection of an employee is limited to the three highest ranked eligible candidates ("the Rule of Three"). *N.J.S.A.* 11A:4–8. The first pilot program would expand the number of eligible candidates from three to ten, thereby testing a "Rule of Ten." As described by the Commissioner, the Rule of Ten:

> expands the list of people who can be hired from a certification, giving more choices in whom [the appointing authorities] can hire and supporting their goal of diversifying their workforce. At the same time, expanding to a "rule of ten" provides opportunities for more job candidates.
>
> . . . .
>
> In a nutshell, the "rule of ten" pilot program will increase the minimum number of names to be considered for selection from three to ten. This means that a participating appointing authority may appoint any eligible among the top ten interested and highest ranking eligibles on the certification provided that veterans preference rights are not affected. For each participating appointing authority, the "rule of ten" will apply to all certifications generated from every open competitive and promotional list, except for those lists which involve public safety, titles, or when special, regular and police and fire reemployment lists are available.
>
> . . . .
>
> The requirements of *N.J.A.C.* 4A:4–4.8 still apply under the "rule of ten" when disposing of a certification. That is, the appointing authority shall provide a statement of the reasons why the appointee was selected instead of a higher ranked eligible or an eligible in the same rank due to a tied score.

The second pilot program, described as "Extension of Working Test Period":

extends the on-the-job evaluation period during which employers can assess candidates' suitability for their jobs—and during which employees can demonstrate their fitness for their positions through actual performance of their duties.

Under the terms of this pilot program, all employees appointed permanently by the state or local government appointing authority are subject to a twelve month working test period. This program tested an alternative to the Act's "Working Test Period" provision, which provides for "[a] working test period following regular appointment of four months, which may be extended to six months at the discretion of the commissioner." *N.J.S.A.* 11A:4-15a; *see also N.J.A.C.* 4A:4-5.2 (establishing length of working test period as three months for local appointments, not subject to extension, and four months for state appointments, subject to two-month extension at appointing authority's discretion).

The Commissioner solicited comments and conducted public hearings on the pilot programs. The CWA objected to the programs, asserting that they exceeded the Commissioner's statutory authority. In response, the Commissioner stated in a letter dated January 23, 1996 that the pilot programs represented a proper exercise of her authority under Section 11i. The CWA appealed to the Appellate Division under *Rule* 2:2-3(a)(2), which provides for an appeal as of right "to review final decisions or actions of any state administrative agency or officer."

While the CWA's appeal was pending, the Office of the Public Defender requested and received approval from the Commissioner to go forward with the two pilot programs. The Public Defender used the Rule–of–Ten program to appoint in permanent positions three Chief Investigators who had been serving provisionally in those positions but who had not been qualified for a permanent appointment under the Rule of Three.

The Appellate Division struck down the pilot programs. It held "that the pilot programs exceed the scope of powers which may be lawfully delegated under *N.J.S.A.* 11a:2-11i; violate its plain language by administratively controverting and altering the express provisions of existing statutes; and that they should not have been adopted without complying with the rule-making re-

quirements of *N.J.S.A.* 52:14B–4." 299 *N.J.Super.* at 167–68, 690 *A.*2d 695.

## II.

 Our analysis begins with the purpose of the Act, which is to ensure efficient public service for state, county, and municipal government. *Borough of Park Ridge v. Salimone,* 21 *N.J.* 28, 44, 120 *A.*2d 721 (1956). In the Act's "Declaration of Policy," it affirms the public policy of the State (1) to select and advance employees on the basis of their relative knowledge, skills, and abilities; (2) to provide public officials with appropriate appointment, supervisory, and other personnel authority to execute their constitutional and statutory responsibilities properly; (3) to encourage and reward meritorious performance by employees in the public service and to retain and separate employees on the basis of the adequacy of their performance; (4) to ensure equal employment opportunity at all levels of public service; and (5) to protect career public employees from political coercion. *N.J.S.A.* 11A:1–2. The goal of the Act is to secure the appointment and advancement of civil service employees based on their merit and abilities. *Kelly v. Civil Serv. Comm'n,* 37 *N.J.* 450, 456, 181 *A.*2d 745 (1962); *Matter of Tavani,* 264 *N.J.Super.* 154, 159, 624 *A.*2d 75 (App.Div. 1993); *see also N.J. Const.* art. VII, § 1, para. 2 (requiring civil service appointments and promotions to be made according to merit and fitness). In striving to meet those goals, the Act seeks to put civil service positions beyond political control, partisanship, and personal favoritism. *See Falcey v. Civil Serv. Comm'n,* 16 *N.J.* 117, 122, 106 *A.*2d 549 (1954); *Prosecutor's Detectives & Investigators Ass'n v. Hudson County Bd. of Chosen Freeholders,* 130 *N.J.Super.* 30, 41, 324 *A.*2d 897 (App.Div.), *certif. denied,* 66 *N.J.* 330, 331 *A.*2d 30 (1974).

██ We hold that the purposes underlying the Act provide the Commissioner with sufficient standards to guide her exercise of authority under Section 11i. *See Avant v. Clifford,* 67 *N.J.* 496, 553, 341 *A.*2d 629 (1975) (recognizing that standards sufficient to

guide exercise of delegated power need not be expressly stated if they may be reasonably inferred from statutory scheme as whole); *Ward v. Scott*, 11 *N.J.* 117, 123, 93 *A.*2d 385 (1952) ("In dealing with the question of standards it is elementary that we are not confined to the specific terms of [the section] but must examine the entire act in the light of its surroundings and objectives."). When establishing pilot programs such as those involved in the present case, the Commissioner may not establish a program contrary to the goals of the Act. Those goals sufficiently channel the Commissioner's discretion. *See Township of Mount Laurel v. Department of the Pub. Advocate*, 83 *N.J.* 522, 533, 416 *A.*2d 886 (1980) (holding "public interest" guidelines sufficient to guide public advocate in exercising its delegated authority); *Cammarata v. Essex County Park Comm'n*, 26 *N.J.* 404, 410, 140 *A.*2d 397 (1958) ("It is settled beyond controversy that the Legislature may enact statutes setting forth in broad design its intended aims, leaving the detailed implementation of the policy thus expressed to an administrative agency."). The Commissioner's authority under Section 11i is also constrained by the requirement that each pilot program conclude after one year. *N.J.S.A.* 11A:2–11i. Should a pilot program established pursuant to Section 11i not conform to the policy requirements outlined in the Act, an aggrieved party may seek judicial review of the program. Judicial review serves as a further check on the Commissioner's Section 11i authority. *See Mount Laurel, supra*, 83 *N.J.* at 533, 416 *A.*2d 886; *Burton v. Sills*, 53 *N.J.* 86, 91, 248 *A.*2d 521 (1968).

Other civil service statutes and regulations also support the Commissioner's authority to establish pilot programs under Section 11i. For example, the Commissioner may "develop programs to improve efficiency and effectiveness of the public service, including, but not limited to, employee training, development, assistance and incentives." *N.J.S.A.* 11A:2–11g. In addition, the Commissioner may relax rules pertaining to civil service "for good cause in a particular situation, on notice to affected parties, in order to effectuate the purpose of Title 11A, New Jersey Statutes." *N.J.A.C.* 4A:1–1.2(c).

The CWA argues that the pilot programs, by modifying existing provisions of the Act, are not "outside the provisions of this title," *N.J.S.A.* 11A:2–11i, and, therefore, are beyond the scope of authority granted to the Commissioner under Section 11i. The Commissioner declines to read Section 11i so narrowly. So narrow a reading would unduly restrict the Commissioner's authority to establish innovative programs consistent with the underlying purposes of the Act. *See In re Felmeister & Isaacs,* 104 *N.J.* 515, 546, 518 *A.*2d 188 (1986) (discussing use of pilot program as testing and tentative probe of new ideas). In determining the correctness of an administrative agency's interpretation of a statute, courts may look beyond statutory language "to the circumstances and objectives surrounding its enactment." *In re Adoption of N.J.A.C. 7:26B,* 128 *N.J.* 442, 450, 608 *A.*2d 288 (1992); *see also P.F. v. New Jersey Div. Of Developmental Disabilities,* 139 *N.J.* 522, 529, 656 *A.*2d 1 (1995) (approving deference to statutory interpretation by administrative agency when interpretation does not clearly conflict with intent of legislature). Such an examination in the present case leads to the conclusion that the pilot programs comport with the underlying purpose of the Act, to ensure an efficient civil service system.

When interpreting legislation, courts seek to "effectuate the legislative intent in light of the language used and the objects sought to be achieved." *State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980); *see also State v. Gonzalez,* 142 *N.J.* 618, 627, 667 *A.*2d 684 (1995) ("[W]hen interpreting a statute, our overriding goal must be to determine the Legislature's intent."); *Kimmelman v. Henkels & McCoy, Inc.,* 108 *N.J.* 123, 129, 527 *A.*2d 1368 (1987) ("In discerning [legislative] intent we consider not only the particular statute in question, but also the entire legislative scheme of which it is a part."). The objectives of the Act are the creation of an effective civil service system through the appointment and promotion of employees based on merit and ability. Those objectives need not depend on certifying only three employees for each available position or on limiting an employee's evaluation period to six months.

The Act is best understood as requiring standards governing the appointment and selection process. So perceived, the Rule of Three is important, not so much in its abstract numerical value, but because it provides a standard that limits the appointing authority's discretion. The number three is not a talisman. *Cf. Terry v. Mercer County Bd. of Chosen Freeholders,* 86 *N.J.* 141, 151, 430 *A.*2d 194 (1981) ("[T]here is nothing intrinsic in the 'rule of three,' either in a constitutional sense or as a matter of legislative contemplation, that renders it totally impervious to reasonable modifications or influences."). Consequently, the purpose of the Rule of Three is to narrow the appointing authority's discretion, not to eliminate it. *Id.* at 149, 430 *A.*2d 194; *In re Crowley,* 193 *N.J.Super.* 197, 214, 473 *A.*2d 90 (App.Div.1984) (noting Rule of Three recognizes discretion of appointing authorities). It follows that the Commissioner, for purposes of a pilot program, may try a different number during a test period. *See Terry, supra,* 86 *N.J.* at 149–50, 430 *A.*2d 194 (noting Rule of Three "recognizes employment discretion and seeks to ensure that such discretion is not exercised in a way inconsistent with 'merit' considerations"); *cf. Falcey, supra,* 16 *N.J.* at 123, 106 *A.*2d 549 (noting Civil Service Commission's power to waive competitive examinations where waiver is not "arbitrary, capricious or unreasonable").

A pilot program based on the Rule of Ten is consistent with the broad purposes of the Act and the specific goals of *N.J.S.A.* 11A:4–8. The Rule of Ten, although it broadens the pool of qualified applicants, requires appointments to be merit-based. First, an appointing authority is limited to the ten applicants who ranked highest on the relevant civil service exam. Thus, the civil service exam continues to play a central role in the certification and appointment of applicants. *Cf. N.J. Const.* art. VII, § 1, para. 2 (requiring civil service appointments to be made according to merit and fitness "to be ascertained, as far as practicable, by examination, which, as far as practicable, shall be competitive"). Second, the appointing authority remains bound by *N.J.A.C.* 4A:4–4.8(b)(4), which requires it to provide a statement to the Commis-

sioner of the reasons why the appointee was selected instead of a higher ranked eligible or an eligible in the same rank due to a tied score. *See Local 518, New Jersey State Motor Vehicle Employees Union v. Division of Motor Vehicles,* 262 *N.J.Super.* 598, 605, 621 *A.*2d 549 (App.Div.1993).

As the Public Defender explained in her letter to the Commissioner, the implementation of the Rule of Ten enables the appointing authority to appoint persons who, although not scoring in the top three on the competitive exam, possess more experience, education or training, or superior communication, managerial, or other skills that are not readily reflected in the exam scores. *See Marranca v. Harbo,* 41 *N.J.* 569, 576, 197 *A.*2d 865 (1964) (suggesting that "the statutory plan may also rest upon a conviction that no test can fully determine fitness"); *see also Cammarata, supra,* 26 *N.J.* at 412, 140 *A.*2d 397 ("It is difficult to evaluate the character, industry, personality, and responsibility of an applicant from his performance on a written examination. . . ."); *Falcey, supra,* 16 *N.J.* at 124–25, 106 *A.*2d 549 (upholding appointment, without examination, of employee with thirty-six years of supervisory experience); *Brown v. State,* 115 *N.J.Super.* 348, 350–51, 279 *A.*2d 872 (App.Div.) (noting education and experience should be considered when relevant in determining applicant's ability to perform required duties of position), *certif. denied,* 59 *N.J.* 273, 281 *A.*2d 535 (1971). Finally, the Rule of Ten also provides the appointing authority a greater ability "to ensure equal employment opportunity at all levels of the public service," *N.J.S.A.* 11A:1–2d, and to create a more diverse workplace environment.

Similarly, the Working Test Period, *N.J.S.A.* 11A:4–15; *N.J.A.C.* 4A:4–5.2, furthers the Act's purpose "to fill government positions upon a basis of merit and fitness to serve" by creating a probationary period of service during which time the appointing authority can observe and evaluate the appointee. *Devine v. Plainfield,* 31 *N.J.Super.* 300, 303, 106 *A.*2d 355 (App.Div.1954). Like the Rule of Three, the Working Test Period provides a reasonable standard for the appointing authority. By limiting the

probationary period to twelve months, the Working Test Period pilot program retains a probationary period that is reasonable. The extended test period enables an appointing authority to make more informed appointment decisions and offers appointees more time to demonstrate their ability to perform the responsibilities of their new position. *Cf. Cammarata, supra,* 26 *N.J.* at 412, 140 *A.*2d 397 (noting that "the crucial test of" applicants' fitness is how they fare "on the job from day to day when suddenly confronted by situations demanding a breadth of resources and diplomacy").

 The conclusion that the two pilot programs rest within the Commissioner's discretion derives in part from the recognition that the programs may remain in effect for only one year. *N.J.S.A.* 11A:2–11i; *see also N.J.A.C.* 4A:1–4.3(a). Moreover, we interpret this one-year limit to begin running at the time that the Commissioner establishes a program. We acknowledge a lack of specificity in the word "establish." To avoid confusion in future pilot programs, the Commissioner should set a date by which the appointing authority may elect to participate in such a program. We also note that appointing authorities who request a pilot program must consult with affected "negotiations representatives" before the submission of a proposal. *N.J.A.C.* 4A:1–4.3(c). This requirement, although it does not mandate negotiations with the negotiations representatives, requires notification of and, when requested, discussion with those representatives. *Compare Black's Law Dictionary* 316 (6th ed.1990) (defining "consultation" as "[d]eliberation of persons on some subject"), *with id.* at 1036 (defining "negotiation" as "process of submission and consideration of offers until acceptable offer is made and accepted"); *cf. Bethlehem Township Bd. of Educ. v. Bethlehem Township Educ. Ass'n,* 91 *N.J.* 38, 47–48, 449 *A.*2d 1254 (1982) (holding regulation requiring "consultation" did not preclude "collective negotiations" that were provided by statute).

## III.

 In light of the statutory standards expressed in the underlying policy of the Act, we cannot say that the Commissioner

exceeded her authority in trying test programs without first conducting rulemaking hearings under the Administrative Procedure Act, *N.J.S.A.* 52:14B–4. Our opinion should not be construed, however, as preventing the Commissioner from conducting such hearings if she finds that they would aid her in the exercise of her statutory authority.

The judgment of the Appellate Division is reversed.

HANDLER, J., dissenting.

In this case, the Appellate Division entered a judgment invalidating the pilot programs that were adopted by the Commissioner of the Department of Personnel. The Appellate Division held that the pilot programs exceed the scope of the powers that may lawfully be delegated under *N.J.S.A.* 11A:2–11i. 299 *N.J.Super.* 166, 167, 690 *A.*2d 695 (1997). I would affirm that judgment substantially for the reasons set forth in the opinion of Judge Landau.

The Court finds that "the purposes underlying" the Civil Service Act (Act), *N.J.S.A.* 11A:1–1 to 12–6, "provide the Commissioner with sufficient standards to guide her exercise of authority under Section 11i." *Ante* at 126, 711 *A.*2d 892. The Court's conclusion, however, disregards the fact that *N.J.S.A.* 11A:2–11i expressly and precisely authorizes the Commissioner to establish pilot programs "outside of the provisions" of the Act. The "standards" believed by the majority to be "sufficient" to guide the Commissioner in the adoption of pilot programs are those derived from the "provisions" of the Act; however, the Commissioner's authority to experiment may be exercised outside of those statutory provisions. The Court does not explain how it can extrapolate from the statute standards that have already been effectively removed. Further, *N.J.A.C.* 4A:1–4.3 permits the Commissioner to establish pilot programs "outside of" the duly adopted rules of the Department. Thus, as Judge Landau points out, the Commissioner has "arrogated to herself the power to ignore not only Title

11A but the Department's own rules." 299 *N.J.Super.* at 171, 690 *A.*2d 695.

In addition, the two cases the majority relies upon to support its position, *Avant v. Clifford,* 67 *N.J.* 496, 341 *A.*2d 629 (1975) and *Ward v. Scott,* 11 *N.J.* 117, 93 *A.*2d 385 (1952), are distinguishable from this case.

In *Avant, supra,* inmates contended that the Legislature had impermissibly delegated to the Commissioner of the Department of Institutions and Corrections the power to define the nature of imprisonment. 67 *N.J.* at 547, 341 *A.*2d 629. The challenged statute provided in pertinent part that the Commissioner "shall have the power to ... determine all matters of policy and shall have the power to regulate the administration of the institutions ... within his jurisdiction." *Id.* at 504 n. 2, 341 *A.*2d 629 (quoting *N.J.S.A.* 30:1–12). In upholding the constitutionality of the statute, the Court held that there was a "statutory pattern guiding imprisonment and corrections, within the well-charted confines of which" the Commissioner must fulfill his delegated mission. *Id.* at 554, 341 *A.*2d 629. This statutory framework included provisions concerning confinement as punishment (*N.J.S.A.* 2A:85–6) (repealed), discouragement of recidivism (2A:85–8) (repealed), rehabilitation by way of incentive (30:4–140), institutional work (30:4–92), work release (30:4–91.3), thrift (30:4–91.4), education (30:4AA–2) (repealed), parole (30:4–106) (repealed), mental health care (30:4–82) (repealed), hospitalization (30:4–7), transfer (30:4–84) (repealed), separation by age (30:4–147), compassionate leave (30:4–8.1), correspondence (30:4–8.3), consent for medical or psychiatric treatment (30:4–7.2), and the maintenance of the commissary (30:4–15). *Id.* at 548, 341 *A.*2d 629. Further, the Legislature had set up a framework of procedural safeguards. *See id.* at 512–13, 341 *A.*2d 629. Every State correctional institution was required to promulgate and publish rules and regulations governing the rights, privileges, duties and obligations of the inmate population. *Ibid.* The publications were required to set forth the authorized sanctions for classes of violations and detail the procedures for imposing punishment and appealing from the infliction thereof. *Id.* at 513, 341 *A.*2d 629. It was only "[with]in the context of that elaborate legislative scheme" that the Commissioner was allowed

to exercise the authority given him. *Id.* at 549, 341 *A.*2d 629. It was "unthinkable that the Department or Commissioner would or could depart from th[e]se legislative strictures." *Id.* at 554, 341 *A.*2d 629.

In contradistinction, the challenged programs in this case purposely depart from specific statutory requirements, *i.e. N.J.S.A.* 11A:4–8 (establishing Rule of Three); *N.J.S.A.* 11A:4–15 (establishing length of probationary period), and are in no way tied to any other legislative strictures. Further, far from granting the Commissioner power that is "hemmed in" by surrounding provisions in the statute, *see Avant, supra,* 67 *N.J.* at 553, 341 *A.*2d 629 (internal citation omitted), the statutory basis for the delegated authority expressly allows the Commissioner to act "outside of the provisions" of the Act. *See N.J.S.A.* 11A:2–11i. Finally, there are no procedural safeguards because *N.J.A.C.* 4A:1–4.3 allows the Commissioner to establish pilot programs without having to adhere to the rule-making process set forth in *N.J.S.A.* 52:14B–4 to – 4.1.

The Court points out that the appointing authority "remains bound by *N.J.A.C.* 4A:4–4.8(b)(4), which requires it to provide a statement to the Commissioner of reasons" why a higher ranked candidate was not chosen. *Ante* at 129, 711 *A.*2d 894. The majority surmises that these reasons might include the lower ranked candidate's greater "experience, education or training, or superior communication, managerial, or other skills that are not readily reflected in the exam scores." *Ibid.* However, reasons of that character are *not* required by the statute and whether such reasons would govern or influence the decisions of an appointing authority is wholly speculative. Appointing authorities should, but need not, take such grounds into consideration. Decisional grounds that are not specified as criteria in the statute, or in any regulation, or in the pilot program itself, and cannot otherwise be clearly implied as a required limitation on the exercise of discretionary authority, may not be fashioned out of whole cloth to salvage a fatally deficient delegation of statutory authority. The majority's

conclusion that such reasons will control the implementation of experimental programs is wishful thinking.

This case can thus be contrasted with *Ward, supra,* wherein a property owner challenged the validity of *R.S.* 40:55–39(d), a statutory provision that permitted a board of adjustment to recommend a variance "in particular cases and for special reasons." 11 *N.J.* at 121, 93 *A.*2d 385. In upholding the statute, the Court found that there were "ample safeguards" to prevent "unwarranted or arbitrary action." *Id.* at 127, 93 *A.*2d 385. Chief among those safeguards was the requirement that the board make "a specific finding of special reasons within the contemplation of the" zoning law. *Id.* at 126, 93 *A.*2d 385. Here, there is no such limitation; the Commissioner may act for reasons that are not delineated and are "outside of" the Act.

I would, accordingly, affirm the judgment of the Appellate Division.

STEIN, J., joins this opinion.

*For reversal*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, COLEMAN and POLLOCK—5.

*For affirmance*—Justices HANDLER and STEIN—2.